UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
SANTOS AMADOR, DARWIN ORTIZ, and :
MARIO AVILA, :
                                   :
                    Plaintiffs, :          **REPORT & RECOMMENDATION**
        – against – :
                                   :          21 Civ. 4633 (EK) (VMS)
109-19 FOOD CORP., RUHANA FOOD :
INTERNATIONAL LLC, LIBERTY :
WHOLESALE FOOD CORP., 241-11 :
LINDEN FOOD CORP., 16611 FOOD CORP., :
RAMIZA FOOD CORP., 351 N. CENTRAL :
FOOD CORP., FOOD FARM CORP., FOOD :
FARM GROUP, INC., SHEAK RIPON a/k/a/ :
RONNIE SHEIK, individually, & SYEDA :
SHAHTAJ, individually, :
                                   :
                    Defendants. :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**Vera M. Scanlon, United States Magistrate Judge:**

This is an action brought by Plaintiffs Santos Amador ("Mr. Amador"), Darwin Ortiz ("Mr. Ortiz") and Mario Avila ("Mr. Avila") (collectively, "Plaintiffs") to recover damages for violations of the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq. (the "FLSA"), and the New York Labor Law, NYLL §§ 190 et seq.; 650 et seq., and the corresponding New York regulations (the "NYLL"). Before the Court is Plaintiffs' motion for a default judgment. For the reasons stated below, the undersigned respectfully recommends that Plaintiff's motion be granted in part and denied in part as to Defendants' liability under the FLSA and the NYLL, and be denied without prejudice as to Plaintiffs' damages. The undersigned also respectfully recommends that Plaintiffs be permitted to move again for an award of damages, in a manner consistent with this report and recommendation, within 30 days of the District Court's adoption of this report and recommendation, if it is adopted.

1

## I.    BACKGROUND

The following facts are taken from Plaintiffs' complaint at ECF No. 1, Plaintiffs'

declarations in support of their motion for default judgment at ECF No. 41 and the corresponding

exhibits.  In light of Defendants' failure to challenge Plaintiffs' allegations by participating in

this lawsuit, the Court will accept all factual allegations in the complaint as true for the purposes

of this motion.  See Jimenez v. Green Olive Inc., 744 F. Supp. 3d 221, 234-35 (E.D.N.Y. 2024)

(collecting cases).

### A.    Factual Background Regarding Defendants

At all times relevant to this action, Defendants 101-19 Food Corp., Ruhana Food

International LLC, Liberty Wholesale Food Corp., 241-11 Linden Food Corp., 16611 Food

Corp., Ramiza Food Corp., 351 N. Central Food Corp., Food Farm Corp. and Food Farm Group,

Inc. (collectively, the "Corporate Defendants")[1] were grocery stores located in Queens and

Nassau Counties, New York.  Compl. ¶¶ 11, 13-21, ECF No. 1.

Defendants 101-19 Food Corp., Ruhana Food International LLC and Liberty Wholesale

Food Corp. (collectively, the "Liberty Defendants") each are New York corporations and/or

limited liability companies with their principal place of business located at 109-19 Liberty

Avenue, South Richmond Hill, New York 11419 in Queens County.  See id. ¶¶ 13-15.

Defendants operated a Food Farm supermarket at this principal place of business (the "Liberty

Location").  See id. ¶¶ 11, 46. The Liberty Location was previously known as "Desi Food

Market," before changing its name to "Food Farm Supermarket" in or around 2015.  See id. ¶¶

61-62.

---

[1] Because the Corporate Defendants did not actively participate in this litigation, the record does
not contain a clear record as to whether these businesses should be considered as properly joined
Defendants.  In light of Defendants' default, the Court will consider them together as described.

Defendant 241-11 Linden Food Corp. (the "Linden Defendant") is a New York corporation with its principal place of business located at 241-11 Linden Boulevard, Elmont, New York 11003 in Nassau County.  See id. ¶ 16.  Defendants operated a Food Farm supermarket at this principal place of business (the "Linden Location").  See id. ¶¶ 11, 46.

Defendants 16611 Food Corp., Ramiza Food Corp. and 351 N. Central Food Corp. (collectively, the "North Central Defendants") each are New York corporations with their principal place of business located at 351 North Central Avenue, Valley Stream, New York 11580 in Nassau County.  See id. ¶¶ 17-19.  Defendants operated a Food Farm supermarket at this principal place of business (the "North Central Location").  See id. ¶¶ 11, 46.  The North Central Location was previously known as "Desi Food Market," before it changed its name to "Food Farm Supermarket" in or around 2015.  See id. ¶¶ 61-62.

Defendants Food Farm Corp. and Food Farm Group, Inc. (collectively, the "Francis Lewis Defendants") each are New York corporations with their principal place of business located at 8961 Francis Lewis Boulevard, Queens Village, New York 11427 in Queens County[2]. See id. ¶¶ 20-21.  Defendants operated a Food Farm supermarket at this principal place of business (the "Francis Lewis Location").  See id. ¶¶ 11, 46.  Although the Francis Lewis Location is permanently closed, the Francis Lewis Defendants remain active as business entities. See id. ¶ 47.

At any given time, the Liberty Location, Linden Location and North Central Location employed eight to twelve employees.[3]  See id. ¶ 66.  The Francis Lewis Location employed five

---

[2] The complaint also states that all corporate defendants also had this location as a principal place of business. See Compl. ¶ 21.

[3] The complaint does not state whether the Liberty Location, Linden Location and North Central Location employed eight to twelve employees each, or in total together.  See Compl. ¶ 66.

to six employees at any given time.  See id.  The Corporate Defendants had annual gross revenues in excess of $500,000.[4]  See id. ¶ 30.

Defendants Sheak Ripon, a/k/a Ronnie Sheikh ("Mr. Ripon"), and Syeda Shahtaj ("Ms. Shahtaj") (collectively, the "Individual Defendants") are owners and operators of the Corporate Defendants.  See id. ¶¶ 22-23.  The Individual Defendants controlled the day-to-day operations of the Corporate Defendants, and they supervised employees of the Corporate Defendants, including Plaintiffs.  See id. ¶¶ 25-26.  As part of this supervision, the Individual Defendants set Plaintiffs' wages and compensation, maintained Plaintiffs' employment records, and set the work schedules and work locations for Plaintiffs.  See id.  ¶¶ 25-26, 63-64.  The Individual Defendants also had the authority to hire and fire Plaintiffs.  See id. ¶¶ 25, 63-64.

**B.    Factual Background Regarding Plaintiffs**

Plaintiffs allege that Defendants maintained and implemented uniform policies regarding wages across each Food Mart location, namely, that employees were paid at weekly rates instead of by the hour.  See id. ¶ 106.  The Court will discuss the wages, hours worked and hourly pay rates for each Plaintiff below.  The Court notes that the allegations as to several Plaintiffs are largely identical, raising questions as to their accuracy, but as Defendants failed to participate actively in this action, the Court will accept the factual allegations in the complaint as true.

**1.    Mr. Amador**

Mr. Amador worked for Defendants as a butcher from around 2012 to around October 2020.  See id. ¶¶ 67-68; Amador Decl. ¶¶ 1, 3, ECF No. 41-4.  Mr. Amador worked at the Liberty Location for most of his time working for Defendants, except for a period of "several

---

[4] The complaint does not state clearly whether the Corporate Defendants each collected this revenue or did so in total. See Compl. ¶ 30.

months" in 2019 when he worked at the Linden Location.  Compl. ¶¶ 69, 76; see Amador Decl. ¶ 2.  From around June 10, 2020, to September or October 2020, Mr. Amador did not work due to a workplace accident.  See Compl. ¶ 67; Amador Decl. ¶ 1.

Throughout this time, Mr. Amador was paid in cash, and he did not receive any wage statements or paystubs for his work.  See Compl. ¶ 74; Amador Decl. ¶ 8.  Defendants did not provide a means for which Mr. Amador could track his hours worked until 2019, when Defendants installed a point of sales ("POS") system, which required Mr. Amador to "punch in and punch out" in order to record his hours worked.  See Compl. ¶ 72; Amador Decl. ¶ 6.

From the period of 2012-2015, Mr. Amador worked six days per week, from approximately 8:00 AM to either 7:00 or 8:00 PM.  See Compl. ¶¶ 67, 70; Amador Decl. ¶ 4.  Even though Mr. Amador was given a half-hour break each day, he worked either 10.5 or 11.5 hours each day, or 63-69 hours per week.  See Compl. ¶¶ 70, 73; Amador Decl. ¶¶ 4, 7.  During this time, Mr. Amador was paid a flat rate of $700 per week.  See Compl. ¶ 75; Amador Decl. ¶ 9.  Mr. Amador's hourly wage during this time period was between $10.14 ($700 divided by 69) and $11.11 ($700 divided by 63).[5]

Beginning in or around 2015, Mr. Amador's wages increased to a flat rate of $750 per week, even though his hours worked remained the same.  See Compl. ¶¶ 70, 73, 75; Amador Decl. ¶¶ 4, 7, 9.  During this time period, Mr. Amador's hourly wage ranged from $10.87 ($750 divided by 69) to $11.90 ($750 divided by 63).

---

[5] Although Plaintiffs do not suggest a means for calculating their hourly rates in the complaint, in their damages statement, Plaintiffs base their calculation of their hourly rates without reference to overtime pay.  See generally Compl.; Pls.' Suppl. Mot. Ex. H, ECF No. 62-8.  Because Defendants failed to actively participate in this litigation, the Court will accept Plaintiffs' theory that Plaintiffs were only paid straight time without overtime as to the proper basis for calculating their hourly rate.

Beginning in 2016, Mr. Amador began working fewer hours per week, although his rate of pay remained the same.  See Compl. ¶ 71, 73, 75; Amador Decl. ¶ 5, 7, 9.  Mr. Amador worked six days per week, "often" from 8:00 AM to 6:00 PM.  Compl. ¶ 71; Amador Decl. ¶ 5.  Accounting for a daily half-hour break, Mr. Amador worked between 8.5 and 9.5 hours per day, or 51-57 hours per week.  See Compl. ¶¶ 71, 73; Amador Decl. ¶¶ 5, 7.  Consequently, during this time period, Mr. Amador's hourly wage ranged from \$13.16 (\$750 divided by 57) to \$14.71 (\$750 divided by 51).

Beginning in 2017, Mr. Amador received a pay raise from \$750 per week to \$800 per week.  See Compl. ¶ 75; Amador Decl. ¶ 9.  Mr. Amador's hours worked remained the same. See Compl. ¶¶ 71, 73; Amador Decl. ¶¶ 5, 7.  Mr. Amador's hourly wage during this time period ranged from \$14.04 (\$800 divided by 57) to \$15.69 (\$800 divided by 51).

Beginning "in or around 2019," Mr. Amador received a pay raise from \$800 per week to \$900 per week.  Compl. ¶ 75; Amador Decl. ¶ 9.  Mr. Amador's hours worked remained the same, apart from the time allotted for meal breaks; with the installation of the POS system, Mr. Amador was permitted to take a one-hour break each day.  See Compl. ¶¶ 71, 73; Amador Decl. ¶¶ 5, 7.  Taking these breaks into account, Mr. Amador worked between 8 and 9 hours per day, or 48-54 hours per week.  See Compl. ¶¶ 71, 73; Amador Decl. ¶¶ 5, 7.  Mr. Amador's hourly wage during this time period ranged from \$16.67 (\$900 divided by 54) to \$18.75 (\$900 divided by 48).

Also "[i]n or around 2019," Mr. Amador was transferred from the Liberty Location to work at the Linden Location.  Compl. ¶ 76; see Amador Decl. ¶¶ 2, 10.  When Mr. Amador was transferred, he was given a raise from \$900 per week to \$1,000 per week.  See Compl. ¶ 76; Amador Decl. ¶ 10.  Mr. Amador's hours of work remained the same.  See Compl. ¶¶ 71; 73;

Amador Decl. ¶¶ 5, 7.  Mr. Amador's hourly wage during this time ranged from $18.52 ($1,000 divided by 54) to $20.83 ($1,000 divided by 48).

For some weeks beginning in or around 2019, Mr. Amador only worked five days per week, rather than six.  See Compl. ¶ 71; Amador Decl. ¶ 5.  For these weeks, accounting for one-hour breaks, Mr. Amador worked between 40 and 45 hours per week.  See Compl. ¶¶ 71; 73; Amador Decl. ¶¶ 5, 7.  For these weeks, Mr. Amador was only paid $800 per week.  See Compl. ¶ 77.  Mr. Amador's hourly wage for these weeks ranged from $17.78 ($800 divided by 45) to $20 ($800 divided by 40). [6]

For the entirety of Mr. Amador's employment with Defendants, he did not receive a wage notice or any other wage statements, and Defendants did not claim any deductions or other credits.  See Compl. ¶¶ 74, 80; Amador Decl. ¶¶ 8, 11.

### 2.    Mr. Ortiz

Mr. Ortiz worked as a butcher and food preparer for Defendants from around October 2018 to around March 2021.  See Compl. ¶¶ 81, 83; Ortiz Decl. ¶¶ 1, 4, ECF No. 41-6.  Mr. Ortiz worked at the Liberty Location from October 2018 to around October 2019, when he was transferred to the Linden Location.  See Compl. ¶¶ 81-82; Ortiz Decl. ¶ 2.  Mr. Ortiz was transferred back to the Liberty Location after working in the Linden Location for around five or

---

[6] Mr. Amador's declaration conflicts with the Complaint on this issue.  In his declaration, Mr. Amador says that the $1,000 rate "continued throughout the remainder of [his] employment." Amador Decl. ¶ 10.  The declaration does not mention his weekly rate being reduced when Mr. Amador worked only 5 days per week.  The Court will assess Defendants' liability for those weeks during which Mr. Amador worked 5 days per week.  The wage calculation made herein is only for the purposes of assessing liability.  If, on Plaintiffs' damages motion, Mr. Amador seeks an overtime provision based on $1,000 per week, he will need to explain the discrepancy noted herein and why the Court should be permitted to award damages based on facts different from those in the complaint.

six months.  See Compl. ¶ 82; Ortiz Decl. ¶ 2.  Mr. Ortiz was sometimes assigned to work at the Francis Lewis and North Central Locations, to cover for other employees.[7]  See Compl. ¶ 82; Ortiz Decl. ¶ 3.  As with Mr. Amador, Mr. Ortiz was not provided a way to track the hours he worked until 2019, when Defendants installed a POS system in the Liberty Location.  See Compl. ¶ 87; Ortiz Decl. ¶ 7.  Defendants stopped requiring employees to track their hours in the POS system "a few months" after it was installed.  Compl. ¶ 87; see Ortiz Decl. ¶ 7.  Mr. Ortiz was paid a flat weekly rate in cash, and he did not receive any wage statements or pay stubs.  See Compl. ¶ 88; Ortiz Decl. ¶ 8.

From in or around October 2018 to early 2019, Mr. Ortiz worked six days per week, first from around 10:00 AM to around 8:00 PM each day, then from around 8:00 AM to 6:00 PM each day.[8]  See Compl. ¶¶ 81, 84; Ortiz Decl. ¶ 5.  Mr. Ortiz was "rarely able to take a break" during this time, as any breaks Mr. Ortiz might to take "were typically interrupted, as he would be required to perform work such as unloading trucks delivering meat or other products and organizing inventory following a delivery."  Compl. ¶ 86; see Ortiz Decl. ¶ 6.  As such, Mr. Ortiz worked ten hours per day, or 60 hours per week.  See Compl. ¶ 84; Ortiz Decl. ¶ 5.  During

---

[7] The complaint and Plaintiffs' motion papers do not state whether Mr. Ortiz was able to take any breaks when working in the North Central and Francis Lewis Locations.  See Compl. ¶ 86; Ortiz Decl. ¶ 6.

[8] Mr. Ortiz's declaration is inconsistent with the allegations in the complaint.  In the complaint, Mr. Ortiz alleges that he worked six days per week, and that he did not work on Tuesdays.  See Compl. ¶ 84.  In his declaration in support of Plaintiffs' motion for default judgment, Mr. Ortiz said he worked six days per week, with Mondays off.  See Ortiz Decl. ¶ 5.  Given that this inconsistency does not affect the total number of hours per week that Mr. Ortiz worked, the Court will not factor this inconsistency into its analysis of Plaintiffs' claims.  The Court notes the inconsistency to point out that relying on the complaint to determine liability presents challenges to the Court when Plaintiffs present conflicting information in their motion papers.  The better practice would have been for Plaintiffs to identify these inconsistencies and explain them or to amend the complaint to correct them, rather than leaving the Court to identify them.

this time period, Mr. Ortiz only received a flat pay rate of $290 per week.  See Compl. ¶ 89; Ortiz Decl. ¶ 9.  Mr. Ortiz's hourly rate during this time was only $4.83 ($290 divided by 60).

"Beginning in or around 2019," Mr. Ortiz's weekly rate of pay increased from $290 to $300.  Compl. ¶ 89; see Ortiz Decl. ¶ 9.  Mr. Ortiz's hours of work remained the same.  See Compl. ¶¶ 84, 86; Ortiz Decl. ¶¶ 5-6.  For the time period beginning in 2019, Mr. Ortiz's hourly rate during this time period was only $5.00 ($300 divided by 60).

"In or around the end of 2019," Mr. Ortiz was transferred from the Liberty Location to the Linden Location.  Compl. ¶ 82; see Ortiz Decl. ¶ 2. In the Linden Location, Mr. Ortiz was "typically able to take thirty (30) minute meal breaks that were rarely interrupted."  Compl. ¶ 86; see Ortiz Decl. ¶ 6.  As a result of these breaks, Mr. Ortiz typically worked 9.5 hours per day during this time period, or 57 hours per week.  See Compl. ¶¶ 84, 86; Ortiz Decl. ¶¶ 5-6.  Upon his transfer to the Linden Location, Mr. Ortiz complained to Mr. Ripon about his low pay.  See Compl. ¶ 90; Ortiz Decl. ¶ 10.  Mr. Ripon increased Mr. Ortiz's weekly pay rate to $600 after Mr. Ortiz complained.  See Compl. ¶ 90; Ortiz Decl. ¶ 10.  When Mr. Ortiz worked at the Linden Location, therefore, his hourly rate was $10.53 ($600 divided by 57).

Mr. Ortiz was transferred back to the Liberty Location after five or six months of working at the Linden Location.  See Compl. ¶ 82; Ortiz Decl. ¶2, 11.  When Mr. Ortiz began working at the Liberty Location again, he no longer enjoyed uninterrupted breaks.  See Compl. ¶ 86; Ortiz Decl. ¶ 6.  As such, Mr. Ortiz resumed working 60 hours per week.  See Compl. ¶ 84; Ortiz Decl. ¶ 5.  Upon his return to the Linden Location, Mr. Ortiz's weekly pay rate also increased to $900.  See Compl. ¶ 91; Ortiz Decl. ¶ 11.  Mr. Ortiz's hourly pay rate during this time was therefore $15.00 ($900 divided by 60).

In February 2020, both Mr. Ortiz's hours and pay were cut short. [9]  Mr. Ortiz began

working only on Saturdays and Sundays, from 8:00 AM to 6:00 PM.  See Compl. ¶ 85.  As Mr.

Ortiz worked at the Liberty Location during this time, he did not have access to uninterrupted

meal breaks.  See id. ¶ 86.  As such, Mr. Ortiz worked 20 hours per week beginning in February

2020.  See id. ¶ 85.  When Mr. Ortiz received this reduction in hours, he also was paid only $300

per week.  See id. ¶ 92.  From February 2020 through remainder of his employment with

Defendants, Mr. Ortiz's hourly rate was $15.00 ($300 divided by 20).

Throughout his employment with Defendants, Mr. Ortiz did not receive a wage notice or

any other wage statements, and Defendants did not claim any deductions or other credits.  See

Compl. ¶¶ 88, 95; Ortiz Decl. ¶¶ 8, 12.

### 3.    Mr. Avila

Mr. Avila worked as a butcher and food preparer at the Liberty Location from "in or

around September 2015" through "in or around late August 2018."  Compl. ¶¶ 96-97; see Avila

Decl. ¶¶ 1-2, ECF No. 41-5.  At the beginning of his employment, Mr. Avila was told to write on

a piece of paper, his name and the times he began and ended his workday.  See Compl. ¶ 100;

Avila Decl. ¶ 6.  Mr. Avila was eventually instructed, though he did not specify when, that he

"did not need to write down his name and hours and that the cashiers would make those notes."[10]

Compl. ¶ 100.  There were no other means or instructions for Mr. Avila to track his hours

worked.  See Compl. ¶ 100; Avila Decl. ¶ 6.  As with Mr. Amador and Mr. Ortiz, Mr. Avila was

---

[9] Although mentioned in the complaint, Mr. Ortiz does not discuss this reduction in his hours in his declaration.  See generally Ortiz Decl.  Given that the conflicting testimony is reasonably read to the complaint to make out a lesser case for which Defendants are on notice, the Court will consider only the hours alleged in the Complaint for this period.

[10] The complaint does not address why this recordkeeping should not be considered sufficient.

paid a flat weekly rate in cash, and he did not receive any wage statements or pay stubs.  See Compl. ¶ 103; Avila Decl. ¶ 7.

While employed with Defendants, Mr. Avila worked six days per week.  See Compl. ¶ 98; Avila Decl. ¶ 4.  Mr. Avila's regular hours were between 10:00 AM and 6:00 PM; however, he would frequently be called in to begin work either one or two hours early.  See Compl. ¶ 98; Avila Decl. ¶ 4.  Although Mr. Avila was supposed to have a fifteen-minute break and a thirty-minute break each day, "these breaks were typically interrupted by tasks including serving customers, especially during holidays and during the summer, which were often busy in the meat department."  Compl. ¶ 99; see Avila Decl. ¶ 5.  As such, excluding breaks, Mr. Avila regularly worked 60 hours per week, although for some weeks, he worked 65 or even 68 hours per week.  See Compl. ¶ 98; Avila Decl. ¶ 4.  During this time, Mr. Avila was paid at a flat rate of $500 per week.  See Compl. ¶ 102; Avila Decl. ¶ 8.  Mr. Avila's hourly rate therefore ranged from $7.35 ($500 divided by 68) to $8.33 ($500 divided by 60).

Throughout his employment with Defendants, Mr. Avila did not receive a wage notice or any other wage statements, and Defendants did not claim any deductions or other credits.  See Compl. ¶¶ 101, 105; Avila Decl. ¶¶ 7, 9.

All Plaintiffs bring claims against Defendants for failure to pay minimum wage under the FLSA and NYLL, failure to pay overtime premiums under the FLSA and NYLL, failure to pay spread-of-hours premiums under the NYLL, failure to pay weekly wages without unlawful deductions and within the week such wages were due under the NYLL by unlawfully withholding minimum wage payments and overtime compensation, failure to provide wage notices under the NYLL, and failure to provide wage statements under the NYLL.  See Compl. ¶¶ 114-142.

11

### C.    Procedural History

Plaintiffs filed this action on August 18, 2021.  See ECF No. 1.  Pursuant to N.Y. Bus.

Corp. L. § 306 and N.Y. Ltd. Liab. Co. L. § 303, service of process on the Corporate Defendants

was effectuated via personal service on an agent of the New York Secretary of State.  See ECF

Nos. 6-14.  Service of process was effectuated on the Individual Defendants via personal service

at their place of business on 109-19 Liberty Avenue, Jamaica, New York 11419.  See ECF Nos.

15-16.  The process server also mailed a copy of the Summons and Complaint to the Individual

Defendants at the same address.  See id.  Only Mr. Ripon obtained counsel and appeared in this

action.  See 1/3/2022 Dkt. Entry ; 1/26/2022 Order.

When Defendants missed their deadlines to answer, the Court scheduled a conference to

discuss Plaintiffs' "intended prosecution of this action[.]"  12/27/2021 Order.  The Court mailed

this Order to Defendants; the mailings to the North Central Defendants were returned as

"Undeliverable."  See ECF Nos. 20-22.  After the Court scheduled this conference, Mr. Ripon

answered the complaint.  See 1/3/2022 Dkt. Entry .

The conference was held on January 26, 2022, which Plaintiffs and counsel for Mr.

Ripon attended.  See 1/26/2022 Minute Entry.  At the conference, Mr. Ripon's counsel raised the

argument that as to some Defendants, they had already litigated wage-and-hour claims with the

federal Department of Labor ("DOL"), such that Plaintiff's claims had either been satisfied or

did not exist because the DOL had investigated and had not identified any claims that were not

resolved by the DOL action.  See 6/3/2022 Order.  Mr. Ripon's counsel also suggested that the

Corporate Defendants had not existed at the time of the alleged violations, raising questions of

successor liability.  See id.  The Court directed Plaintiffs to investigate the Corporate

Defendants' history and identities, and the DOL action, and told the parties to propose a joint

discovery schedule.  See 1/26/2022 Order.  In the parties' proposed discovery schedule, Plaintiffs said they would "serve a FOIL Request to the U.S. DOL seeking documents regarding their investigation and consent judgment against Ripon."  ECF No. 24 at 1.  The Court directed Plaintiff to file a letter indicating whether Plaintiffs would seek entries of default against the non-appearing Defendants.  See 2/10/2022 Order.

On March 24, 2022, Mr. Ripon's counsel filed a motion to withdraw as attorney, as Mr. Ripon's counsel was "owed substantial fees and expenses on this matter and [does] not believe that [Counsel] will be reimbursed.  In addition, Mr. Ripon has not responded to [Counsel] with respect to the limited discovery (Interrogatories) which were served in this matter."  Graziadei Aff. ¶ 4, ECF No. 26-1.  Following a conference,[11] the Court granted Mr. Ripon's counsel's motion to withdraw.  See 6/28/2022 Order.  The Court also issued the following Order in connection with the conference on Mr. Ripon's counsel's motion to withdraw:

> [o]n or before July 29, 2022, the individual Defendants may appear and represent themselves by contacting the Court in writing.  The corporate Defendants may appear by that date by having counsel file a notice of appearance and other necessary paperwork.  If any party does not appear on or before July 29, 2022, Plaintiffs may request a certificate of default by August 31, 2022, and after it is entered, move for a default judgment.  As discussed, Plaintiffs' counsel must provide confirmation that service was adequately made on any Defendant against which Plaintiffs seek a default judgment, particularly in light of the statements by counsel that the corporate Defendant businesses are closed (although they may still exist as legal entities subject to service) and that the individual Defendants have been residing outside of the United States.  Service of any default judgment motion must comply with the Local Rules.

---

[11] In the order scheduling the conference on Defendants' counsel's motion to withdraw, the Court warned the non-appearing Defendants that "a continuing failure to participate may result in a motion by Plaintiffs for a default judgment against Defendants.   Failure to participate in this litigation may lead to a wavier of the right to raise defenses to Plaintiffs' claims."  6/3/2022 Order.  The Court mailed Order to the non-appearing Defendants; the mailings to the North Central Defendants, the Linden Defendant, North Central Defendants and Defendant 101-19 Food Corp. were returned as "undeliverable."  See id.; ECF Nos. 28-32.

Id.  The Court mailed a copy of this Order to all Defendants; the mailings to the Francis Lewis

Defendants were returned as undeliverable.  See ECF Nos. 35-36.

After none of the Defendants, including Mr. Ripon, filed a notice of appearance by the

Court's deadline, Plaintiffs filed a timely request for a certificate of default as to all Defendants.

See ECF No. 37.  The Clerk of Court filed an entry of default as to Mr. Ripon, despite his

answer.  See ECF No. 38.  Plaintiffs filed a motion for default judgment against all Defendants.

See ECF Nos. 40-42.  Plaintiffs submitted, as an exhibit to their motion papers, a consent

judgment entered between the Secretary of Labor and Mr. Ripon for Mr. Ripon's violations of

the FLSA resolved in the prior DOL action.  See Pls.' Mot. Ex. G, ECF No. 41-7.  Plaintiffs were

not listed among the employees entitled to damages under this consent judgment.  See id. at 9-

10.  Plaintiffs did not offer any explanation as to why they were not included in the DOL

judgment, even though they claim to have worked for Defendants during periods covered by the

DOL investigation.  See id. ¶ 5; Compl. ¶¶ 67, 81, 96.  Plaintiffs also included in their motion

papers listings of each Corporate Defendant as "active" on the New York State Department of

State website.  See ECF No. 41-9.  The District Court referred Plaintiffs' motion for a default

judgment to the undersigned for a report and recommendation.

On August 14, 2023, the Clerk of Court vacated the certificate of default as to Mr. Ripon.

See 9/8/2022 Dkt. Entry.  Following this vacatur, the Court scheduled a conference with

Plaintiffs' counsel to address issues with the motion.  See 8/24/2023 Order.  Specifically, the

Court's Order directed Plaintiffs to address

> 1) as to the motion for a default judgment as to the corporate Defendants, whether
> Plaintiffs complied with Local Rule 55.2(c) by servicing [sic] the default judgment
> motion with all attachments on the corporate Defendants' business addresses. The
> service appears to have been on the Secretary of State, which does not comply with
> the Local Rule; 2) why Plaintiffs served the motion for a default judgment as to Ms.
> Shahtaj at the Copiague Street address as her residence under Local Rule 55.2(c),

and if such location is her residence, to identify what evidence there is in the record to confirm that fact; 3) whether Plaintiffs wish to withdraw the motion for a default judgment against Mr. Ripon in light of the filing of the answer and the vacatur of the certificate of default by the Clerk's Office; and 4) if the answer to Item 3 is yes, whether Plaintiffs intend to file a motion to strike the answer then a motion for default judgment as to Mr. Ripon.

Id. The Court held the conference. See 8/29/2023 Order. Following the conference, the Court administratively closed Plaintiffs' default judgment motion as to all Defendants, ordered Plaintiffs to file a motion to strike Mr. Ripon's answer, and, if such motion were granted, to supplement their motion for default judgment "with proof of compliance with the Servicemembers Civil Relief Act on the motion for a default judgment" and "an up-to-date 'live' spreadsheet with damages calculations, including interest calculations." Id. The Court mailed a copy of this Order to the non-appearing Defendants; the mailings to the Francis Lewis Defendants and Defendant Ramiza Food Corp. were returned as undeliverable. See ECF Nos. 51-53.

Plaintiffs timely moved to strike Mr. Ripon's answer. See ECF Nos. 46-48. On a referral from the District Court, see 9/23/2023 Order, the undersigned issued a report and recommendation, recommending that Mr. Ripon's answer be stricken from the record. See ECF No. 54. After no objections were filed, the District Court adopted the report and recommendation in full and permitted Plaintiffs to request a new certificate of default as to Mr. Ripon. See ECF No. 57. Mr. Ripon's answer was stricken from the record on April 29, 2024. See 1/3/2022 Dkt. Entry (as modified on April 29, 2024, to reflect that the answer filed January 3, 2022, had been stricken).

Plaintiffs filed supplemental papers to their default judgment motion. See ECF Nos. 61-62. Pursuant to 28 U.S.C. § 636(b)(1)(B), the District Court referred Plaintiffs' renewed motion for default judgment to the undersigned for a report and recommendation.

15

## II.    LEGAL STANDARD FOR DEFAULT JUDGMENT

Federal Rule of Civil Procedure ("Rule") 55 "provides a two-step process for obtaining a default judgment."  Priestley v. Headminder, Inc., 647 F.3d 497, 504 (2d Cir. 2011).  In the first step, upon a showing, "by affidavit or otherwise," that the party against whom default judgment is sought "has failed to plead or otherwise defend" the action, then "the clerk must enter the party's default."  Fed. R. Civ. P. 55(a).  Once the clerk has entered a default, then, at the plaintiff's request, the clerk must enter default judgment if "the plaintiff's claim is for a sum certain or a sum that can be made certain by computation[.]"  Fed. R. Civ. P. 55(b)(1).  If the calculation of damages requires any level of discretion, the plaintiff may petition the court for a default judgment.  See Fed. R. Civ. P. 55(b)(2).

"The dispositions of motions for entries of defaults and default judgments . . . are left to the sound discretion of a district court because it is in the best position to assess the individual circumstances of a given case and to evaluate the credibility and good faith of the parties."  Enron Oil Corp. v. Diakuhara, 10 F.3d 90, 95 (2d Cir. 1993); see Rodriguez v. Almighty Cleaning, Inc., 784 F. Supp. 2d 114, 123 (E.D.N.Y. 2011).  Nevertheless, a court may not enter default judgment "in a manner inconsistent with due process of law."  City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 132 (2d Cir. 2011) (citation omitted); see Enron, 10 F.3d at 96 (observing that "procedural rules" governing default judgments "play a constructive role in maintaining the orderly and efficient administration of justice").  A court facing a default judgment motion must ensure both that "a plaintiff satisfied all required procedural steps in moving for default judgment," and that "a plaintiff's allegations, when accepted as true, establish liability as a matter of law[.]"  Jiao v. Shang Shang Qian Inc., No. 18 Civ. 5624 (ARR) (VMS), 2020 WL 6370148, at *6 (E.D.N.Y. Aug. 11, 2020), report & recommendation adopted, 2020

16

WL 5105063 (E.D.N.Y. Aug. 31, 2020).  Once a defendant has defaulted, "a court is required to accept all of the [plaintiff's] factual allegations as true and draw all reasonable inferences in its favor[.]"  Finkel v. Romanowicz, 577 F.3d 79, 84 (2d Cir. 2009) (noting that the court must still independently determine "whether the [plaintiff's] allegations establish [the defendant's] liability as a matter of law").

Not every claim in a complaint will lead to an award of damages, even if the defendants have defaulted.  If a plaintiff raises a claim in a complaint but fails to mention it in the ensuing default judgment motion, a court may consider that claim abandoned.  See Duan v. Studio M Bar & Lounge Inc., No. 20 Civ. 2240 (RPK) (JRC), 2024 WL 4250262, at *3 n.8 (E.D.N.Y. Jan. 31, 2024) (considering FLSA and NYLL retaliation claims abandoned when the plaintiffs "alleged retaliation claims under the NYLL and FLSA [in the amended complaint], but failed to mention these claims in their motion for default judgment"); Zabrodin v. Silk 222, Inc., 702 F. Supp. 3d 102, 121 (E.D.N.Y. 2023) (finding that the plaintiffs abandoned their claim for unlawful deductions and kickbacks in their complaint when they did "not elaborate on, or even mention, these deductions in their supporting memorandum or affidavits, nor [did] they appear to have included them in their damages computation").

Furthermore, "[w]hile a party's default is deemed to constitute a concession of all well pleaded allegations of liability, it is not considered an admission of damages."  Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992).  The court "must conduct an inquiry sufficient to establish damages to a 'reasonable certainty.'"  Gunawan v. Sake Sushi Restaurant, 897 F. Supp. 2d 76, 83 (E.D.N.Y. 2012) (quoting Credit Lyonnais Sec. (USA), Inc. v. Alcantara, 183 F.3d 151, 155 (2d Cir. 1999)).  A plaintiff's damages must "naturally flow

from the injuries pleaded." <u>Fermin v. Las Delicias Peruanas Restaurant, Inc.</u>, 93 F. Supp. 3d 19, 29 (E.D.N.Y. 2015) (quoting <u>Greyhound</u>, 973 F.2d at 159).

## III.    DISCUSSION

As a preliminary matter, the Court notes that Plaintiffs originally brought this action as a putative class and collective action. <u>See</u> Compl. ¶¶ 31-45. In their motion, Plaintiffs do not seek a default judgment against Defendants on behalf of any members of a putative collective action or class. <u>See</u> Pls.' Notice Mot., ECF No. 40 (proposing damages for Messrs. Amador, Ortiz and Avila only); Pls.' Mem. L., ECF No. 42; Pls.' Suppl. Mem. L., ECF No. 61. Plaintiffs' only mention of a putative FLSA collective action or NYLL class comes in Plaintiffs' description of the procedural history of this action, not in their argument. <u>See</u> Pls.' Mem. L. at 1-2. The Court therefore finds that Plaintiffs have abandoned their class and collective action claims. <u>See</u> <u>Jimenez</u>, 744 F. Supp. 3d at 251-52. As such, the Court will consider Plaintiff's motion for default judgment only as pertaining to Messrs. Amador, Ortiz and Avila.

### A.    Plaintiffs' Compliance With Procedural Rules

In evaluating a motion for default judgment, a court "should consider whether Plaintiffs have shown that Defendants had notice about the action and an opportunity to defend against it." <u>Fermin</u>, 93 F. Supp. 3d at 30. Generally, a "motion for default judgment will not be granted unless the party making the motion adheres to all of the applicable procedural rules." <u>Jimenez</u>, 744 F. Supp. 3d at 241-42 (citations omitted). Before default judgment can be granted, the Court must determine whether Plaintiffs complied with the Federal Rules of Civil Procedure, the Local Civil Rules of the Southern and Eastern Districts of New York, and the Servicemembers Civil Relief Act.

18

### 1.    Federal Rule of Civil Procedure 4

Service of process of an individual and a corporate entity is valid under the Federal Rules of Civil Procedure if it complies with "state law for serving a summons in an action . . . in the state where the district court is located or where service is made." Fed. R. Civ. P. 4(e)(1) (service on an individual); Fed. R. Civ. P. 4(h)(1)(A) (service on a corporation, partnership or association). As this action was commenced in the Eastern District of New York, service of process complies with the Federal Rules if it is permissible under New York law.

New York permits service of process on an individual by personally delivering the summons and complaint to

> a person of suitable age and discretion at the actual place of business, dwelling place or usual place of abode of the person to be served and by either mailing the summons to the person to be served at his or her last known residence or by mailing the summons by first class mail to the person to be served at his or her actual place of business in an envelope bearing the legend "personal and confidential" and not indicating on the outside thereof, by return address or otherwise, that the communication is from an attorney or concerns an action against the person to be served, such delivery and mailing to be effected within twenty days of each other.

N.Y.C.P.L.R. § 308(2). Service of process on a corporation or limited liability company can be completed by

> [p]ersonally delivering to and leaving with the secretary of state or [a] deputy, or with any person authorized by the secretary of state to receive such service, at the office of the department of state in the city of Albany, duplicate copies of such process together with the statutory fee, which fee shall be a taxable disbursement.

N.Y. Bus. Corp. L. § 306(b)(1)(i); N.Y. Ltd. Liab. Co. L. § 303(a)(1).

The Court finds that Plaintiffs properly effectuated service of process on the Individual Defendants. Plaintiffs' process server stated in a sworn affidavit that he personally delivered the summons and complaint to Abdul Mozid ("Mr. Mozid"), an employee of suitable age and discretion, at 109-19 Liberty Avenue, Jamaica, New York 11419. See ECF Nos. 15-16. This

address is an actual place of business for both Mr. Ripon and Ms. Shahtaj, as owners and operators of Defendant 101-19 Food Corp.[12]  See Compl. ¶¶ 13, 22-23.  Plaintiffs' process server also stated that the day after he delivered the summons and complaint to Mr. Mozid, he mailed a copy of the summons and complaint to Mr. Ripon and Ms. Shahtaj via first class mail to the same address, "in a securely sealed and postpaid wrapper with the words 'PERSONAL AND CONFIDENTIAL' written on the same envelope and not indicating on the outside that it is from an attorney or concerns an action against the person to be served[.]"  ECF Nos. 15-16.  As the Individual Defendants were served in accordance with New York law, they were properly served under Rule 4.

The Court also finds that Plaintiffs properly effectuated service of process on the Corporate Defendants.  Plaintiffs' process server personally delivered a copy of the summons and complaint to Sue Zouky, an agent of the Secretary of State, at the Secretary's office in Albany.  See ECF Nos. 6-14.  Ms. Zouky indicated that she was authorized to accept service on behalf of each of the Corporate Defendants.  See id.  As the Corporate Defendants were served in accordance with New York Business Corporation and Limited Liability Company Law, they, too, were properly served under Rule 4.

Apart from the original service of process of the summons and complaint, the Court and Plaintiffs mailed the docket in this action, along with several scheduling Orders, status reports and accompanying documents, to Defendants.  See 12/27/2021 Order; 6/3/2022 Order;

---

[12] Plaintiffs' affidavits of service on Mr. Ripon and Ms. Shahtaj state that the summons and complaint was mailed to 109-19 Liberty Avenue, Jamaica, New York 11419, instead of 109-19 Liberty Avenue, Queens, New York 11419, the address listed in the Complaint.  See Compl. ¶ 13; ECF Nos. 15-16.  Given that the summons and complaint were also personally delivered to this address, and that Plaintiffs' process server swears that the address is the actual place of business, the Court will assume for the purposes of this motion that the summons and complaint were properly mailed.

6/28/2022 Order; 8/29/2023 Order; ECF Nos. 19, 45.  Even though several mailings were returned as undeliverable, see ECF Nos. 20-22; 28-32; 35-36; 51-53; 55-56, Plaintiffs and the Court diligently endeavored to have Defendants participate in this action.  The Court notes that Mr. Ripon originally appeared in this action, see 1/3/2022 Dkt. Entry, confirming that he received notice of the case, and, implicitly, his corporations were on notice as well.

### 2.    Local Civil Rule 55.2[13]

In addition to effectuating proper service on under the Federal Rules, a movant for default judgment must also comply with the Local Civil Rules of the Southern and Eastern Districts of New York (the "Local Civil Rules").  Courts within this District generally require strict compliance with the Local Rules "[a]bsent special circumstances."  Dacas v. Duhaney, No. 17 Civ. 3568 (EK) (VMS), 2023 WL 6297530, at *6 (E.D.N.Y. Sept. 8, 2023), report & recommendation adopted, 2023 WL 6294227 (E.D.N.Y. Sept. 27, 2023).  In many cases, "failure to comply with [Local Civil Rule 55.2] is a basis to deny a motion for default judgment." Zabrodin, 702 F. Supp. 3d at 116.  Nevertheless, courts have excused a plaintiff's minor violations of Local Civil Rule 55.2, if the "complaint and default judgment papers provide sufficient notice of the relief sought as part of the motion for default judgment," and if the

---

[13] Local Civil Rule 1.1 provides that "[t]hese Local Civil Rules take effect on January 2, 2025 (the 'Effective Date') and govern actions pending or filed on or after that date.  For actions pending on the Effective Date, if fewer than 14 days remain to perform an action governed by these Rules, the provisions of the previous Local Rules effective on January 1, 2025 will govern."  The Court notes a gap in the Rule, in relation to which version of the Local Civil Rules applies to motions filed when one version of the Local Civil Rules was in effect but the motion was decided after a subsequent version of the Local Civil Rules came into effect, as here.  The Court addresses this gap by applying the version of the Local Civil Rules in effect at the time this motion was filed in considering the motion, as these were the only Rules of which Plaintiff had notice at the time of filing.

noncompliance "does not prejudice [the defendants]." Jiao, 2020 WL 6370148, at *7; see Zabrodin, 702 F. Supp. 3d at 117.

Under Local Civil Rule 55.2, the moving party in a default judgment motion must file "(1) the Clerk's certificate of default, (2) a copy of the claim to which no response has been made, and (3) a proposed form of default judgment." Local Civ. R. 55.2(b). The moving party must also mail all required moving papers "to the party against whom a default judgment is sought at the last known residence of such party (if an individual) or the last known business address of such party (if a person other than an individual)." Local Civ. R. 55.2(c).

Here, the Court finds that the requirements of Local Civil Rule 55.2 have been substantially met. As part of Plaintiffs' original motion papers, Plaintiffs' counsel submitted a declaration with the complaint and a proposed judgment as exhibits. See Pls.' Mot. Ex. A, ECF No. 41-1; Pls.' Mot. Ex. K, ECF No. 41-11. Although Plaintiffs did not submit an updated proposed judgment in their supplemental motion papers, Plaintiffs did submit an updated calculation of damages, in response to an Order from the Court. See 8/29/2023 Order; Pls.' Suppl. Mot. Ex. H, ECF No. 62-8. The Court finds that these documents placed Defendants on notice of the claims for which they may be liable, and the damages they may owe.

As to Local Civil Rule 55.2(c), Plaintiffs filed multiple certificates of service stating that Plaintiffs' motion papers were mailed to all the Corporate Defendants at their business addresses. See ECF Nos. 63; 66. Plaintiffs also served both motions on the Individual Defendants at their last known residences. See ECF Nos. 43; 63; 66. Plaintiffs obtained the last known residence for Ms. Shahtaj through a LexisNexis report that Plaintiffs ran at the start of this action. See ECF Nos. 44 at 3; 50 6:6-18. The Individual Defendants signed the postal envelopes, indicating

22

that they received the motion papers.  See Pls.' Mot. Ex. C at 28-31, ECF No. 41-3.  The Court

finds that these certificates of service comply with the Local Civil Rule.

The Court recommends excusing Plaintiffs' technical noncompliance with Local Civil

Rule 55.2(b)(1).  In their original motion for default judgment, Plaintiffs filed an affidavit

showing that the Clerk of Court entered default on all Defendants.  See Pl.'s Mot. Ex. B, ECF

No. 41-2.  This entry of default against Mr. Ripon has since been vacated, see 9/8/2022 Dkt.

Entry, but Plaintiffs did not include the Clerk's renewed entry of default against Mr. Ripon in

their supplemental motion papers.  See generally ECF No. 62.  As the Court already established

in its prior report and recommendation, Mr. Ripon has been on notice of this case and his

potential liability, and he nevertheless has refused to participate in this action.  See ECF Nos. 54

at 9; 57 (adopting the report and recommendation).  Because Mr. Ripon has been served with all

the motion papers in this motion, the Court finds that Mr. Ripon would not be prejudiced with

this technical violation of Local Civil Rule 55.2(a)(1)(a).  See ECF Nos. 63; 66.

### 3.    Servicemembers Civil Relief Act

In any civil action "in which the defendant does not make an appearance[,]" the court

must ensure that the plaintiff has complied with the Servicemembers Civil Relief Act ("SCRA")

before entering a default judgment.  50 U.S.C. § 3931.  In order to comply with the SCRA, the

plaintiff moving for default judgment must file an affidavit "stating whether or not the defendant

is in military service and showing necessary facts to support the affidavit[.]"  50 U.S.C. §

3931(b)(1)(A).  In order to affirm that a defendant was not in military service, the plaintiff must

conduct an investigation both "after the commencement of an action or proceeding" and "after a

default in appearance[.]"  Tenemaza v. Eagle Masonry Corp., No. 20 Civ. 452 (AMD) (VMS),

2021 WL 8317120, at *5 (E.D.N.Y. July 22, 2021) (quoting Pruco Life Ins. Co. of New Jersey v.

Est. of Locker, No. 12 Civ. 882 (ENV) (RML), 2012 WL 3062754, at *1 (E.D.N.Y. July 23, 2012)).

Plaintiffs complied with the SCRA. Upon serving the summons and complaint, Plaintiffs' process server asked Mr. Mozid, who accepted service on behalf of Mr. Ripon and Ms. Shahtaj, whether Mr. Ripon and Ms. Shahtaj were in military service, "and received a negative reply." ECF Nos. 15-16. As part of their motion papers for default judgment, Plaintiffs filed an affidavit stating that Mr. Ripon and Ms. Shahtaj were not in military service, and they attached, as an exhibit, reports from the Department of Defense Manpower Data Center stating that Mr. Ripon and Ms. Shahtaj were never in military service. See Pelton Suppl. Decl. ¶ 4, ECF No. 62; Pls.' Suppl. Mot. Ex. A, ECF No. 62-1. The Court finds that this is sufficient evidence of investigations into Mr. Ripon's and Ms. Shahtaj's respective military status, both when this action was commenced and after default was entered.

Given that Plaintiffs have complied with Rule 4 and the SCRA, and that Plaintiffs have substantially complied with Local Civil Rule 55.2, the Court finds that Plaintiffs' default judgment motion is procedurally valid.

## B. Factors Required For A Default Judgment

Once a court establishes that service on the defendants was proper, the "next question, before reaching liability or damages, is whether [a defendant's] conduct is sufficient to warrant entry of a default judgment." Melo v. Milagro Grocery Corp., No. 21 Civ. 4438 (PKC) (SJB), 2024 WL 4250267, at *6 (E.D.N.Y. Sept. 26, 2024). In order to determine whether default judgment is warranted, courts consider "(1) whether the default was willful; (2) whether ignoring the default would prejudice the opposing party; and (3) whether the defaulting party has presented a meritorious defense." Fermin, 93 F. Supp. 3d at 30-31 (citing Swarna v. Al-Awadi, 622 F.3d 123, 142 (2d Cir. 2010)).

The Court finds that the first factor in evaluating default judgment is satisfied.  A "defendant's failure to respond to the complaint is sufficient to demonstrate willfulness." Fermin, 93, F. Supp. 3d at 31 (collecting cases).  Defendants have all "failed to plead or otherwise defend" this action.  Fed. R. Civ. P. 55(a).  The Corporate Defendants were served on either September 14 or September 15, 2021, meaning they were required to respond to the complaint on October 5 and 6, 2021.  See Fed. R. Civ. P. 12(a)(1)(A)(i); ECF Nos. 6-14.  As the Individual Defendants were served on September 21, 2021, their deadline to answer or otherwise respond to the complaint was October 12, 2021.  See Fed. R. Civ. P. 12(a)(1)(A)(i); ECF Nos. 15-16.  Of all the Defendants, only Mr. Ripon responded to the complaint, but Mr. Ripon's answer was stricken after Mr. Ripon's "continued lack of participation in this case[.]"  ECF No. 57; see 1/3/2022 Dkt. Entry.  As the Court already noted in its prior report and recommendation, Mr. Ripon "was aware of this litigation" as shown by the facts that he retained counsel, filed an answer, and then ceased communicating and paying his attorney.  See ECF No. 54 at 8.  After his counsel withdrew, Mr. Ripon still failed to participate in this action, despite being ordered by the Court to do so.  See id.  Defendants' failure to participate in this action is deemed willful.

The Court also finds that the second requirement of a default judgment is satisfied.  A plaintiff may suffer prejudice upon the denial of a default judgment motion if no other options are available for the plaintiff to obtain relief.  See Fermin, 93 F. Supp. 3d at 31.  Such is the case for Plaintiffs in this action.  This action was originally filed on August 17, 2021; in the three years since this action was filed, Defendants have not answered or appeared to participate in this case in any meaningful matter.  As Plaintiffs' counsel stated during the August 29, 2023, conference before the Court, Plaintiffs made efforts as to Defendants' appearances "tracking down the defendants and working to get them served."  ECF No. 50 4:21-25.  The Court finds

25

that if default judgment were to be denied, Plaintiffs would not have other options to obtain relief from Defendants and would suffer prejudice accordingly.

Defendants have not established a meritorious defense in this action, even though they may very well have had valid defenses based on the facts of the case or the previous litigation with the DOL.  When a defendant has not answered a complaint, the defendant has no defense, let alone a meritorious one.  See id.; Pich v. Queens Garden Nursery Inc., No. 22 Civ. 3362 (MKB) (MMH), 2024 WL 687234, at *4 (E.D.N.Y. Feb. 20, 2024), report & recommendation adopted, 2024 WL 967636 (E.D.N.Y. Mar. 6, 2024).  Here, Mr. Ripon is the only defendant to have ever filed an answer, which has been stricken from the record.  See 1/3/2022 Dkt. Entry; ECF No. 57.  Any defenses that Mr. Ripon may have potentially raised in his stricken answer are not meritorious.  See Luo v. Baldwin Union Free Sch. Dist., 677 F. App'x 719, 720 (2d Cir. 2017) (summary order) (noting that the "practical effect of" granting a motion to strike an answer is a default judgment).  As such, the Court finds that Defendants do not have any meritorious defenses to this action.

The Court finds that all three factors necessary for a default judgment have been met for this case. Therefore, the Court will analyze whether Defendants are liable to Plaintiffs for violations of the FLSA and the NYLL based on the allegations in the complaint.

### C.    Liability

In order to determine whether a defendant in default is liable for a plaintiff's claims, "a court may accept all well-pleaded allegations in the unanswered complaint as true but must still satisfy itself that the plaintiff has established a sound legal basis on which liability may be imposed."  Santillan v. Henao, 822 F. Supp. 2d 284, 290 (E.D.N.Y. 2011).  The Court will examine whether, accepting Plaintiffs' well-pled allegations as true, Plaintiffs are protected

26

under the FLSA and the NYLL, followed by whether Defendants are liable for wage-and-hour violations under the FLSA and NYLL.

### 1.    Applicability Of The FLSA

In order to establish liability under the FLSA, a plaintiff must prove "(1) the defendant is an employer subject to [the] FLSA; (2) the plaintiff is an 'employee' within the meaning of [the] FLSA; and (3) the employment relationship is not exempted from [the] FLSA."[14]  Payamps v. M&M Convenience Deli & Grocery Corp., No. 16 Civ. 4895 (LDH) (SJB), 2018 WL 3742696, at *4 (E.D.N.Y. May 18, 2018) (citation & internal ellipses omitted); see Isett v. Aetna Life Ins. Co., 947 F.3d 122, 127-28 (2d Cir. 2020); Zheng v. Liberty Apparel Co. Inc., 355 F.3d 61, 66 (2d Cir. 2003); Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 139 (2d Cir. 1999).  In addition, in order to qualify for the FLSA's overtime protections, a plaintiff must show either that the employees are "engaged in commerce," or that the employer is an "enterprise engaged in commerce[.]"  Jacobs v. New York Foundling Hosp., 577 F.3d 93, 96-97 (2d Cir. 2009) (quoting 29 U.S.C. § 207(a)(1) (emphasis removed)); Sanchez v. Ms. Wine Shop Inc., 643 F. Supp. 3d 355, 366-67 (E.D.N.Y. 2022).

### a.    Statute Of Limitations

Although the FLSA statute of limitations is normally two years, the limitations period may be extended to three years for "a cause of action arising out of a willful violation[.]"  29 U.S.C. §255(a).  In a motion for default judgment, a court will apply the three-year statute of limitations if the plaintiff alleges that the defendant's actions were "knowing and willful."  Dacas, 2023 WL 6297530, at *6.  In this action, the three-year FLSA limitations period applies.

---

[14] There are other formations of liability under the FLSA; this formation is applicable in this case.  See, e.g., 29 U.S.C. §§ 201 et seq.

Plaintiffs allege that Defendants' conduct "constitutes a willful violation of the FLSA within the meaning of 29 U.S.C. § 255(a)."  Compl. ¶¶ 116, 120.  Because Plaintiffs filed their complaint on August 17, 2021, the limitations period for Plaintiffs' FLSA claims extends to August 17, 2018.  See ECF No. 1.

The FLSA statute of limitations cuts off liability for some Plaintiffs' FLSA claims.  Mr. Ortiz began working for Defendants in around October 2018, making his claims timely under the FLSA.  See Compl. ¶ 81.  Although Mr. Amador worked for Defendants from around 2012 to 2020, only his FLSA claims for conduct beginning August 17, 2018, are timely.  See id. ¶ 67.

Mr. Avila, meanwhile, has failed to show that any significant portion of his wage-and-hour claims are timely under the FLSA.  The complaint and Mr. Avila's declaration both state that Mr. Avila worked for Defendants only until "late August 2018," without any specific dates or other information to determine whether "late August" falls before or after August 17, 2018.[15] Id. ¶ 96.  Based on the complaint, the Court cannot determine whether Mr. Avila ceased working for Defendants on, before or after August 17, 2018.  Rather than try to determine that answer which is not evident on the face of the complaint, the Court will consider that Mr. Avila worked one day within the limitations period, given that Plaintiffs mention "late August," and make a claim under the FLSA based on this period.

Therefore, the Court respectfully recommends that Plaintiffs' motion for default judgment on the FLSA claims be denied as to any violations that took place prior to August 17, 2018.

---

[15] Plaintiffs' updated damages calculation sheet lists the end of Mr. Avila's employment as August 25, 2018, which would make Mr. Avila's FLSA claims timely for only one week.  See Pls.' Suppl. Mot. Ex. H at 3.  As Plaintiffs do not provide any factual basis for this date, the Court will not consider August 25, 2018, to be the last day of Mr. Avila's employment.

b.    **Defendants' Engagement In Interstate Commerce**

The FLSA limits the scope of its wage-and-hour protections to plaintiffs who are engaged in interstate commerce.  See, e.g., Jacobs, 577 F.3d at 96 (citing 29 U.S.C. § 207(a)(1)); Cabrera v. Canela, 412 F. Supp. 3d 167, 178 (E.D.N.Y. 2019).  A plaintiff may satisfy the "engaged in commerce" requirement of the FLSA by establishing either that the plaintiff employee "personally engaged in interstate commerce or in the production of goods for interstate commerce," or that the defendant employer was "an enterprise engaged in interstate commerce or in the production of goods for interstate commerce."  Rodriguez, 784 F. Supp. 2d at 120. These types of coverage are respectively known as "individual coverage" and "enterprise coverage."  See id.  As is relevant in this case, the FLSA defines an "enterprise engaged in commerce or in the production of goods for commerce" as a business that, inter alia, "has employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person[,]" and has an "annual gross volume of sales made or business done [of] not less than $500,000."  29 U.S.C. § 203(s)(1)(A).

On a motion for default judgment, a plaintiff's otherwise conclusory allegations in the complaint may establish enterprise FLSA coverage if "it may be inferred from the type of business enterprise that it was engaged in interstate commerce."  Cabrera, 412 F. Supp. 3d at 179-80 (collecting cases).  A court may infer that a grocery store, where employees regularly stock and handle food products that logically "would have originated outside of New York," is an enterprise engaged in commerce.  Reyes-Fana v. Moca Grocery NY Corp., No. 21 Civ. 4493 (AMD) (RER), 2022 WL 5428688, at *5 (E.D.N.Y. Aug. 16, 2022), report & recommendation adopted, 2022 WL 4094241 (E.D.N.Y. Sept. 7, 2022) (collecting cases); see Martinez v. New

168 Supermarket LLC, No. 19 Civ. 4526 (CBA) (SMG), 2020 WL 5260579, at *3 (E.D.N.Y. Aug. 19, 2020), report & recommendation adopted, 2020 WL 5259056 (E.D.N.Y. Sept. 3, 2020) (inferring that the defendant is engaged in interstate commerce, despite allegations "that merely repeat the language of [the FLSA]," because "it is logical to infer" that a supermarket stocked products originating outside New York); Cardoza v. Mango King Farmers Market Corp., No. 14 Civ. 3314 (SJ) (RER), 2015 WL 5561033, at *4 (E.D.N.Y. Sept. 1, 2015), report & recommendation adopted, 2015 WL 5561180 (E.D.N.Y. Sept. 21, 2015) (finding that allegations that the plaintiffs stocked shelves, packed produce, and organized inventory were sufficient to establish interstate commerce).

Here, the Court finds that Defendants are an enterprise engaged in commerce. Plaintiffs allege that the Corporate Defendants "have had gross revenues in excess of $500,000." Compl. ¶ 30. Plaintiffs also allege that, as part of their jobs as butchers and food preparers, they prepared and packaged meat and interacted they with customers for that meat. See id. ¶ 68, 83, 97. As butchers, Plaintiffs had extensive responsibilities involving meat. See id. ¶ 68, 83, 97. Mr. Ortiz allege that his job duties involved unloading trucks that had delivered meat and other food products and organized inventory. See id. ¶ 86. Based on these allegations, it is logical to infer that at least some of the products sold in Defendants' grocery stores, including the meat, came from outside New York State. As such, for the purposes of this motion, the Court finds that Defendants are collectively an "enterprise engaged in interstate commerce[,]" and therefore subject to the FLSA. Rodriguez, 784 F. Supp. 2d at 120.

### c.    Defendants' Status As Employers

Under the FLSA, the definition of "employer" is liberally construed beyond common law principles of agency. See Irizarry v. Catsimatidis, 722 F.3d 99, 103 (2d Cir. 2013). The Second Circuit looks to the "economic reality" of the relationship between the plaintiff and the

defendant, based on the totality of the circumstances. Id. at 104. In order to determine the status of a putative employer, courts examine "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." Barfield v. New York City Health & Hosps. Corp., 537 F.3d 132, 142 (2d Cir. 2008) (quoting Carter v. Dutchess Cmty. Coll., 735 F.2d 8, 12 (2d Cir. 1984)). The lack of one factor "is not fatal" to a plaintiff's claims, as the economic reality test is based on the totality of the circumstances. Fermin, 93 F. Supp. 3d at 36.

An individual defendant may also be an "employer" for the purposes of the FLSA if the individual exercised "operational control" over the defendant company "was engaged in the culpable company's affairs to a degree that it is logical to find him liable to the plaintiff employees[.]" Irizarry, 722 F.3d at 106, 117 (affirming the liability of an individual defendant based on his "active exercise of overall control over the company, his ultimate responsibility for the plaintiffs' wages, his supervision of managerial employees," and his "almost daily" visits to some of his grocery stores). In order to determine whether an individual defendant is an "employer" under the FLSA, courts use the same "economic reality" test as is used for a corporate defendant. See Fermin, 93 F. Supp. 3d at 35.

Multiple defendants, both corporate and individual, may be jointly and severally liable for FLSA violations if the defendants act as a "single integrated enterprise." Cao v. Wedding in Paris LLC, 727 F. Supp. 3d 239, 275 (E.D.N.Y. 2024). In order to evaluate whether multiple defendants are a single integrated enterprise, "courts consider (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." Saavedra v. Twin Kitty Bakery Corp., No. 18 Civ. 00932 (PKC) (PK), 2021

31

WL 1394487, at *7 (E.D.N.Y. Feb. 16, 2021) (quoting Apolinar v. R.J. 49 Rest., LLC, No. 15 Civ. 8655 (KBF), 2016 WL 2903278, at *4 (S.D.N.Y. May 18, 2016)), report & recommendation adopted, 2021 WL 1169321 (E.D.N.Y. Mar. 29, 2021) (finding a single integrated enterprise when the defendant bakeries "shared a common name[,]" "maintained common policies and practices with respect to their employees' work[,]" and the plaintiffs "were [considered] employees of all" defendants); see Rosa v. La Oficina of Queens, Inc., No. 18 Civ. 06915 (FB) (PK), 2023 WL 2745214, at *8 (E.D.N.Y. Mar. 17, 2023), report & recommendation adopted, 2023 WL 2736237 (E.D.N.Y. Mar. 31, 2023) (finding a single integrated enterprise across multiple  nightclubs when the plaintiff "was assigned shifts at all three of the Clubs, and was told that, no matter which club he worked at, he would receive the same compensation").

Under the economic reality test, the Court finds that the Individual Defendants and the Corporate Defendants are all employers, as defined by the FLSA.  Plaintiffs allege that Mr. Ripon visited "the supermarket locations on a monthly basis, where he [met] with managers to discuss business operations and personnel matters[.]" Compl. ¶ 63.  Mr. Ripon also had the authority to hire and fire employees, oversaw business operations and "set[] and enforc[ed] business policies and practices including the pay practices complained of herein."  Id.  Mr. Ripon also set employee's compensation, as employees would directly petition Mr. Ripon whenever they wanted a raise.  See id.  Likewise, Ms. Shahtaj also visited the grocery store locations "several times per week" to meet with managers and oversee business matters.  Id. ¶ 64.  As with Mr. Ripon, Ms. Shahtaj had "the power to hire and fire employees, set their wages, retain time and/or wage records, and otherwise control the terms and conditions of their employment."  Id. ¶ 65.  The regular visits, oversight of business operations and employee compensation, and power to hire and fire employees also establish that Mr. Ripon and Ms. Shah exercised "operational

control" over the Corporate Defendant grocery stores.  Irizarry, 722 F.3d at 106.  As such, they fit the FLSA's definition of "employer."

The Court also finds that Plaintiffs have sufficiently alleged that Defendants operated as a "single integrated enterprise."  Cao, 727 F. Supp. 3d at 275.  The grocery stores at issue were all named "Food Farm Supermarket" at some point.  See Compl. ¶¶ 11, 46-47, 61-62.  The Corporate Defendants had common ownership and management under Mr. Ripon and Ms. Shahtaj, who would visit the different grocery stores on a regular basis to observe business operations.  See id. ¶¶ 22-24, 64-65.  Employees were frequently transferred from one grocery store to another as work needs arose.  See id. ¶ 59.  Throughout the grocery stores, Mr. Ripon and Ms. Shah used many of the same business practices, including a similar method of tracking employees' hours.  See id. ¶ 57.  Although Mr. Ripon and Ms. Shahtaj operated multiple grocery stores, the stores were treated as one business operation.  See id. ¶¶ 11, 24, 57.  As Plaintiffs have sufficiently alleged that Defendants are a single integrated enterprise, Defendants may be held jointly and severally liable for wage-and-hour violations under the FLSA.

### d.    Plaintiffs' Status As Employees

Generally, if a defendant is a covered employer in an action alleging violations of the FLSA, the plaintiff is a covered employee.  With certain exceptions, the FLSA defines an "employee" as "any individual employed by an employer."  29 U.S.C. § 203(e)(1).  In order to determine whether an individual is an employee under the FLSA, courts in the Second Circuit apply the same "economic reality" test as the FLSA's "employer" analysis.  See Irizarry, 722 F.3d at 104.

Here, the Court has already found that Defendants may be held jointly and severally liable as employers under the FLSA.  See, supra, Part III.C.1.c.  Plaintiffs, as butchers, do not fall

33

under any exceptions to the FLSA's definition of "employee." See 29 U.S.C. § 203(e); Compl. ¶¶ 68, 83, 97. The Court finds that Plaintiffs are all "employees" as defined by the FLSA.

### e.    Applicability Of FLSA Exemptions

Even if either an employer or employee is engaged in commerce, Plaintiffs may not recover under the FLSA if they fall within the FLSA's "litany of exemptions." Fermin, 93 F. Supp. 3d at 32 (noting that a "kitchen helper/food preparer" is not an exempt employee); see 29 U.S.C. § 213(a). The "burden rests on the employer to prove that a particular employee is exempt from the [FLSA's] requirements." Harvey v. Homebound Mortgage, Inc., 547 F.3d 158, 163 (2d Cir. 2008). A defendant in default "fail[s] to sufficiently invoke any exemptions." Cao, 727 F. Supp. 3d at 275. On a motion for default judgment, therefore, a court may find that litigants are not exempt employees if they "do not allege any facts that would make them exempt under the FLSA or NYLL." Id.

Here, the Court finds that no exemptions apply to Plaintiffs. Plaintiffs worked for Defendants as butchers, where they prepared, packaged and sold meat to customers. See Compl. ¶¶ 68, 83, 97. As food preparers, Plaintiffs are not exempt employees. See Fermin, 93 F. Supp. 3d at 32. Moreover, because Defendants have defaulted in this action, "they have failed to sufficiently invoke any [FLSA] exemptions." Jimenez, 744 F. Supp. 3d at 247. As such, the Court finds that Plaintiffs are covered employees under the FLSA.

### 2.    Applicability Of The NYLL

"[In order to] plead a NYLL claim, [a plaintiff] must establish that [the] employment relationship with Defendants falls within the NYLL, which applies to any person employed for hire by an employer in any employment." Solis v. Tropical Restaurant Bar Inc., No. 23 Civ.

1707 (ENV) (MMH), 2024 WL 4271234, at *8 (E.D.N.Y. Sept. 19, 2024) (citations & quotation marks omitted).

### a.    Statute Of Limitations

The statute of limitations for NYLL claims is six years. See N.Y. Lab. L. §§ 198(3) , 663(3).  Because this action was filed on August 17, 2021, the presumptive limitations period for Plaintiffs' NYLL claims began August 17, 2015.  See generally ECF No. 1.

New York's response to the Covid-19 pandemic extended the limitations period for Plaintiffs' NYLL claims.  New York Executive Order 202.8, signed March 20, 2020, tolled "any specific time limit for the commencement, filing, or service of any legal action . . . as prescribed by the procedural laws of this state."  N.Y. Exec. Order 202.8.  This tolling period was extended several times, through several subsequent executive orders, until it ended on November 3, 2020. See N.Y. Exec. Order 202.67.  Although this tolling period does not affect any limitations periods for federal statutes, see Romero v. Manhattan & Bronx Surface Transit Operating Auth., No. 21 Civ. 491 (LJL), 2022 WL 624451, at *5-6 (S.D.N.Y. Mar. 2, 2022), courts have interpreted these executive orders as a toll, rather than a suspension, of statutes of limitations for New York laws.  See Powell v. Scollard, No. 21 Civ. 1477 (VSB), 2023 WL 5975249, at *3-4 (S.D.N.Y. Sept. 14, 2023); McLaughlin v. Snowlift, Inc., 185 N.Y.S.3d 212, 213-14 (2d Dep't 2023).  As such, the statute of limitations on the NYLL was tolled from March 20, 2020, to November 3, 2020, or 228 days.  Taking this tolling period into effect, the limitations period for Plaintiffs' NYLL claims began January 1, 2015. [16]

Mr. Ortiz and Mr. Avila started working for Defendants in or around October 2018, and September 2015, respectively. See Compl. ¶¶ 81, 96.  These dates, even approximated, are

---

[16] August 17, 2015 – 228 = January 1, 2015.

within the NYLL's limitations period.  As such, Messrs. Ortiz and Avila's entire employment periods are timely under the NYLL.

Even with the tolling period, the statute of limitations still cuts off liability for some of Mr. Amador's NYLL claims.  Mr. Amador began working for Defendants in or around 2012, years before the limitations period under the NYLL begins.  See Compl. ¶ 67.  As such, any of Mr. Amador's claims based on conduct occurring before January 1, 2015, would be untimely.  Therefore, the Court respectfully recommends that Plaintiffs' motion for default judgment be denied as to Mr. Amador's NYLL claims that occurred before January 1, 2015.

### b.    Substantive Coverage Requirements

Coverage for an employee under the NYLL is more expansive than it is under the FLSA.  In order to establish liability under the NYLL, a plaintiff must "prove that he was an employee and that [the defendants] were employer[s] as defined by the statue and accompanying regulations."  Sanchez, 643 F. Supp. 3d at 368-69 (quoting Ethelberth v. Choice Sec. Co., 91 F. Supp. 3d 339, 360 (E.D.N.Y. 2015)).  Unlike the FLSA, the NYLL does not have a minimum revenue requirement or necessitate participation in interstate commerce.  See Burns v. Scott, 635 F. Supp. 3d 258, 274 (S.D.N.Y. 2022).

Generally, a plaintiff who falls under the FLSA's umbrella will enjoy the NYLL's protections as well.  Although the Second Circuit has not definitively ruled on whether the NYLL and the FLSA apply the same tests for an employer or a joint employer, see Irizarry, 722 F.3d at 117; Perez Perez v. Escobar Construction, Inc., 23-1240-cv, 2024 WL 3594325, at *2 n.3 (2d Cir. July 31, 2024) (summary order), the Second Circuit "construe[s] the NYLL definition [of an employee] as the same in substance as the definition in the FLSA."  Velarde v. GW GJ, Inc., 914 F.3d 779, 783 (2d Cir. 2019) (quoting Glatt v. Searchlight Pictures, Inc., 811 F.3d 528,

534 (2d Cir. 2016)).  District courts in the Second Circuit have held that the "NYLL's definition of [an] employer is . . . nearly identical to that of the FLSA, and the analysis of the employment relationship is based on the same factors."  Cao, 727 F. Supp. 3d at 275 (citations & quotation marks omitted); see Zabrodin, 702 F. Supp. 3d at 117.  In order to determine joint and several liability for multiple defendants, courts apply the same standard to FLSA and NYLL claims.  See See Echevarria v. ABC Corp., No. 21 Civ. 4959 (JS) (ARL), 2023 WL 5880417, at *5 (E.D.N.Y. Sept. 11, 2023), adhered to on reconsideration, 2024 WL 1639934 (E.D.N.Y. Apr. 16, 2024); Khan v. Nyrene, Inc., No. 18 Civ. 557 (ARR) (ST), 2020 WL 1931282, at *5 (E.D.N.Y. Mar. 11, 2020), report & recommendation adopted, 2020 WL 1929066 (E.D.N.Y. Apr. 21, 2020); Fermin, 93 F. Supp. 3d at 37.  "Generally, where liability is found under the FLSA, it is also found under the NYLL."  Palaghita v. Alkor Capital Corp., No. 19 Civ. 154 (ARR) (RER), 2021 WL 4464121, at *8 (E.D.N.Y. Aug. 20, 2021), report & recommendation adopted, 2021 WL 4463483 (E.D.N.Y. Sept. 29, 2021).

Here, the Court has already established that Defendants were jointly and severally liable as employers under the FLSA, and that Plaintiffs were non-exempt employees.  See, supra, Part III.C.1.  For these same reasons, Plaintiffs are employees, and Defendants are employers, under the NYLL.  Within the limitations period, Plaintiffs are entitled to the NYLL's protections.

### 3.    Defendants' Wage-and-hour Violations

Because the FLSA limitations period falls within the NYLL limitations period, and because a covered employee under the FLSA is also protected by the NYLL, there is significant overlap in liability among the FLSA and the NYLL.  Where there is overlap, the Court will examine Defendants' potential liability under the FLSA and the NYLL together.  In making these assessments, the Court relies on the complaint, which is based on Plaintiffs' recollections.

a.    **Overtime Violations**

The FLSA requires an employee to "be compensated at a rate of no less than one and one-half times the regular rate of pay for any hours worked in excess of forty per week[.]" Nakahata v. New York-Presbyterian Healthcare Sys., Inc., 723 F.3d 192, 200 (2d Cir. 2013); see 29 U.S.C. § 207(a). New York regulations also require employers to "pay an employee for overtime at a wage rate of one and one-half times the employee's regular rate in the manner and methods provided in and subject to the exemptions of" the FLSA. N.Y. Comp. Codes R. & Regs. tit. 12 § 142-2.2. With certain exceptions, the NYLL characterizes a "legal day's work" as eight hours. N.Y. Lab. L. § 160. In order to establish "a plausible FLSA overtime claim, a plaintiff must sufficiently allege 40 hours of work in a given workweek as well as some uncompensated time in excess of the 40 hours." Lundy v. Catholic Health Sys. of Long Island, Inc., 711 F.3d 106, 114 (2d Cir. 2013); see Fermin, 93 F. Supp. 3d at 44 (noting that the pleading requirements for an overtime claim "appl[y] in the context of the NYLL as well"). Under the NYLL, similar calculations are to be made. "Absent statutory exceptions, a flat sum compensation generally violates the overtime requirements of the FLSA and the NYLL when an employee works in excess of 40 hours per week without additional hourly compensation." Sanchez, 643 F. Supp. 3d at 370.

On a motion for default judgment, the bar to establish a plaintiff's hours worked is low. When a defendant has defaulted, "the court may presume that the plaintiff's recollection and estimates of the hours he worked are accurate." Jimenez, 744 F. Supp. 3d at 249 (noting that "it would be unfair to require more substantial proof of improper compensation when the defendant is not participating in the case and the plaintiff lacks the ability to obtain the defendant's employment records through discovery"). Nevertheless, a plaintiff must "provide sufficient

detail about the length and frequency of [the] unpaid work to support a reasonable inference that [the plaintiff] worked more than forty hours in a given week." Nakahata, 723 F.3d at 201.

Although a court may assume the accuracy of an employee's estimated hours worked, the court still must independently determine whether, based on these estimates, a defendant is liable for overtime violations.  For example, the court must examine whether, based on the plaintiff's well-pleaded factual allegations, the plaintiff received any bona fide breaks, such as meal breaks. A bona fide meal period is not compensable under either the FLSA or the NYLL.  See Tambriz, 577 F. Supp. 3d at 325 (citations omitted); Villanueva v. 179 Third Avenue Rest. Inc., 500 F. Supp. 3d 219, 235 (S.D.N.Y. 2020), report & recommendation adopted, No. 16 Civ. 8782 (AJN) (RWL), 2021 WL 2139441 (S.D.N.Y. May 26, 2021) (citations omitted).

In the Second Circuit, a meal break is not bona fide if "the employee is required to be on-call to handle whatever work arises during the [meal] break." Herrera v. Comme des Garcons, Ltd., 84 F.4th 110, 116 (2d Cir. 2023) (citing 29 C.F.R. § 785.19(a)); see Shanfa Li v. Chinatown Take-Out Inc., 812 F. App'x 49, 52 (2d Cir. 2020) (summary order) (affirming the district court's finding that a meal break was not bona fide because the plaintiffs only "spent about twenty minutes eating meals, during which time they could be required to stop eating if a task needed completion").  If an employer grants time for meal breaks but "interrupt[s] or shorten[s] them," that break time is therefore compensable as hours worked.  Jesus v. Gotham Cleaners Inc., No. 23 Civ. 4783 (PAE) (SLC), 2024 WL 4264906, at *7 (S.D.N.Y. Aug. 1, 2014) report & recommendation adopted, 2024 WL 4891890 (S.D.N.Y. Nov. 26, 2024) (quoting Villanueva, 500 F. Supp. 3d at 235).

The Court will assess whether, accounting for meal breaks, Defendants are liable for unpaid overtime premiums for Messrs. Amador, Ortiz and Avila, respectively.

### i.    Mr. Amador

Mr. Amador alleges that between 2015 and 2016, he worked from 8:00 AM to either 7:00 or 8:00 PM, six days per week.  See Compl. ¶ 70.  During this time, Mr. Amador acknowledged that he "was typically allowed to take a thirty (30) minute break per day."  Id. ¶ 73.  As Mr. Amador alleges that he was able to take a break for at least 30 minutes without interruption, the Court finds that Mr. Amador received a bona fide meal break each day, making Mr. Amador's 30 minutes of break time each day non-compensable.  Mr. Amador, therefore, accounting for breaks, worked between 10.5 and 11.5 per day, or 63-69 hours per week.

Mr. Amador's hours changed beginning in 2016.  See id. ¶ 71.  Beginning 2016, Mr. Amador still worked six days per week, but now worked "nine (9) to ten (10) hours per day," or "fifty-four (54) to sixty (60) hours per week, minus breaks[.]"  Id.  Mr. Amador still enjoyed a daily 30-minute bona fide meal break during this time.  See id. ¶ 73.  As such, accounting for meal breaks, Mr. Amador worked between 8.5 and 9.5 hours per day, or 51-57 hours per week.

In 2019, with the introduction of the POS system, Mr. Amador's break time was further extended from 30 minutes per day to 60 minutes per day.  See id.  Mr. Amador continued to work six days a week, for "nine (9) to ten (10) hours per day," minus breaks.  Id. ¶ 71.  Accounting for daily hour-long bona fide meal breaks, beginning in 2019, Mr. Amador worked between eight and nine hours per day, or 48-54 hours per week.

Throughout Mr. Amador's employment with Defendants, even accounting for bona fide meal breaks, Mr. Amador consistently worked for more than 40 hours per week.  Mr. Amador also declares that throughout his employment with Defendants, he "was paid a flat weekly rate," in cash, regardless of the hours he worked.  See id. ¶ 74.  Mr. Amador therefore did not receive any overtime premiums for hours worked in excess of 40 hours per week.  See id. ¶ 78.  As such,

40

the Court respectfully recommends that Defendants be found liable to Mr. Amador for overtime violations under the FLSA and the NYLL.

Although Defendants may have generally violated overtime laws with respect to Mr. Amador's employment, Mr. Amador may not be able to recover overtime damages for all weeks in which he worked for Defendants.  For some weeks beginning "in or around 2019," Mr. Amador worked only five days per week.  Id. ¶ 71.  During those weeks, if Mr. Amador received an hour-long break, he may have only worked between 40 and 45 hours per week.  See id. ¶¶ 71, 73.  Mr. Amador would not receive damages for overtime violations for any weeks where he worked nine hours per day, enjoyed an hour-long meal break, and worked five days per week, as for those weeks, he would only have worked 40 hours.

### ii.    Mr. Ortiz

Mr. Ortiz alleges that at the beginning of his employment, he worked six days a week, ten hours per day.  See id. ¶ 84.  During this time, when Mr. Ortiz worked at the Liberty Location, Mr. Ortiz was "rarely able to take a break[.]"  Id. ¶ 82, 86.  When Mr. Ortiz "was able to take breaks to quickly eat, they were typically interrupted, as he would be required to perform work such as unloading trucks delivering meat or other products and organizing inventory following a delivery."  Id. ¶ 86.  Given that Mr. Ortiz was ordered to work throughout his meal breaks, and that his meal breaks were frequently interrupted, the Court finds that Mr. Ortiz did not enjoy bona fide meal breaks when he worked at the Liberty Location.  As such, Mr. Ortiz worked ten compensable hours a shift at the Liberty Location, or 60 hours per week.  See id. ¶¶ 82, 84.

When Mr. Ortiz worked at the Linden Location for a six-month period between 2019 and 2020, he "was typically able to take thirty (30) minute meal breaks that were rarely interrupted."  Id. ¶¶ 82, 86.  As these meal breaks lasted at least thirty minutes without interruptions, the Court

finds that Mr. Ortiz enjoyed <u>bona fide</u> meal breaks when he worked at the Linden Location. During this time, although Mr. Ortiz's total shift hours remained the same, 30 minutes of each day were not compensable.  <u>See</u> Compl. ¶ 84.  Mr. Ortiz therefore worked 9.5 hours per day, or 57 hours per week, while working at the Linden Location.  <u>See</u> <u>id.</u> ¶ 82.

Beginning February 2020, Mr. Ortiz's hours changed, and he only worked two days per week, in ten-hour shifts.  <u>See</u> <u>id.</u> ¶ 85.[17]  As Mr. Ortiz worked at the Liberty Location during this time, <u>see</u> <u>id.</u> ¶ 82, the Court finds that Mr. Ortiz did not enjoy a <u>bona fide</u> meal break for his reduced shifts in 2020.  <u>See</u> <u>id.</u> ¶ 86.  Nevertheless, because Mr. Ortiz only worked two days per week beginning in February 2020, he only worked twenty hours per week.  <u>See</u> <u>id.</u> ¶ 85.  Because Mr. Ortiz did not work in excess of 40 hours per week beginning in February 2020, he was not eligible for overtime premiums beginning in February 2020.

Nevertheless, Mr. Ortiz worked over 40 hours per week prior to February 2020, even accounting for <u>bona fide</u> meal breaks.  Mr. Ortiz declares that throughout his employment with Defendants, he was paid in cash at a "flat weekly rate," regardless of the hours he worked.  <u>See</u> <u>id.</u> ¶¶ 88, 93.  Mr. Ortiz therefore did not receive any overtime premiums for hours worked in excess of 40 hours per week.  <u>See</u> <u>id.</u> ¶ 93.  As such, the Court respectfully recommends that Defendants be found liable to Mr. Ortiz for overtime violations under the FLSA and the NYLL from the period of October 2018 to February 2020.

---

[17] Mr. Ortiz does not mention this reduction in hours in his declaration, but it appears in the complaint.  <u>See generally</u> Ortiz Decl.  As this reduction in hours affects Defendants' overtime liability, the Court will consider only the allegations in the complaint in its analysis on this point. <u>See</u> Fed. R. Civ. P. 54(c) ("A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings.").

### iii.    Mr. Avila

Mr. Avila alleges that he worked six days per week, from 10:00 AM to 8:00 PM.  See id. ¶ 98.  While Mr. Avila "was permitted to take a fifteen (15) minute break in the morning and a thirty (30) minute break for lunch," Mr. Avila alleges that he seldom enjoyed a full thirty-minute break, as "these breaks were typically interrupted by tasks including serving customers, especially during holidays and during the summer, which were busy in the meat department."  Id. ¶ 99.  Given that Mr. Avila's breaks were "typically" interrupted, and that Mr. Avila was expected to serve customers through his breaks if customers appeared, the Court finds that Mr. Avila was "on call" throughout his breaks.  See Herrera, 84 F.4th at 116.  As such, the Court finds that Mr. Avila did not enjoy a bona fide meal break during his employment with Defendants, and his frequently interrupted breaks are compensable as time worked.

The Court finds that even accounting for potential breaks, Mr. Avila consistently worked over 40 hours per week.  Given that Mr. Avila did not receive a bona fide meal break, he worked throughout his ten-hour shifts.  See id. ¶ 98.  Mr. Avila also alleges that he was "often called in to start one (1) or two (2) hours early."  Id.  Although Mr. Avila does not allege how frequently he would be asked to work before the start of his shift, he "typically worked sixty (60) hours per week and sometimes as many as sixty-five (65) to sixty-eight (68) hours per week."  Id.

Mr. Avila also alleges that throughout his employment with Defendants, he "was paid a flat weekly rate," in cash, regardless of the hours he worked.  See id. ¶ 101.  Mr. Ortiz therefore did not receive any overtime premiums for hours worked in excess of 40 hours per week.  See id. ¶ 103.  As such, the Court respectfully recommends that Defendants be found liable to Mr. Avila for overtime violations under the NYLL.

b.      **Minimum-wage Violations**

The FLSA and the NYLL each set minimum hourly wages for each covered employee. See 29 U.S.C. § 206; N.Y. Lab. L. § 652.  The federal minimum wage under the FLSA was $7.25 per hour for all relevant times.  See 29 U.S.C. § 206(a)(1)(C).  Compliance with the FLSA's minimum wage provision does not "excuse noncompliance" with a state's minimum wage law, if the state's minimum wage is higher.  29 U.S.C. § 218(a).

The minimum wage under the NYLL during the relevant limitations period based on the employer's geographic location and the number of employees.  See N.Y. Lab. L. § 652(1). Within the relevant limitations period, minimum wages under the NYLL differed depending on whether the employee "worked" in New York City, in Nassau, Suffolk and Westchester counties, or in other counties in New York State.  N.Y. Lab. L. §§ 652(1)(a)-(c).  Within New York City, minimum wage rates were higher for "[l]arge employers" (defined as employers "of eleven or more employees") than for "[s]mall employers" (defined as employers of "ten or less employees").  N.Y. Lab. L. § 652(1)(a).  Where, as here, multiple work locations operate as a single integrated enterprise, courts may consider the collective number of employees across all locations.  See, e.g., Rosa, 2023 WL 2745214, at *8-9.

Plaintiffs allege that the Liberty Location, Linden Location and North Central Location "employed between eight and twelve (8-12) employees at any given time, not counting the Individual Defendants."  Compl. ¶ 66.  They also allege that the Francis Lewis Location "employed between five and six (5-6) employees, not counting the Individual Defendants."  Id. It is not clear from the complaint whether the Liberty, Linden and North Central Locations each employed 8-12 employees, or employed 8-12 employees in total.  Nevertheless, even assuming that the three locations only employed 8-12 employees in total, Defendants collected 15

employees at a minimum across all locations.  This satisfies the threshold to consider Defendants, collectively, a "[l]arge employer" under the NYLL.  See N.Y. Lab. L. § 652(1)(a)(i).

Even though Defendants may collectively be considered a "large employer," the applicable minimum wage for each Plaintiff depended on the location at which each Plaintiff worked.  The Liberty Location, at 109-19 Liberty Avenue, Queens, New York, 11419 is in Queens County in New York City.  See Compl. ¶ 11; ZIP Code By Address, United States Postal Service, https://tools.usps.com/zip-code-lookup.htm?byaddress (last visited Mar. 1, 2025) (entering "109-19 LIBERTY AVENUE QUEENS NY 11419").  The Linden Location, at 241-11 Linden Boulevard, Elmont, New York, 11003 is in Nassau County.  See Compl. ¶ 11; ZIP Code By Address, United States Postal Service, https://tools.usps.com/zip-code-lookup.htm?byaddress (last visited Mar. 1, 2025) (entering "241-11 LINDEN BLVD ELMONT NY 11003").  The North Central Location, at 351 North Central Avenue, Valley Stream, New York, 11580 is in Nassau County.  See Compl. ¶ 11; ZIP Code By Address, United States Postal Service, https://tools.usps.com/zip-code-lookup.htm?byaddress (last visited Mar. 1, 2025) (entering "351 N. CENTRAL AVE., VALLEY STREAM NY 11580").  The Francis Lewis Location, at 8961 Francis Lewis Boulevard, Queens Village, New York, 11427 is in Queens County.  See Compl. ¶ 11; ZIP Code By Address, United States Postal Service, https://tools.usps.com/zip-code-lookup.htm?byaddress (last visited Mar. 1, 2025) (entering "8961 FRANCIS LEWIS BLVD QUEENS VILLAGE NY 11427").

Because the Liberty and Francis Lewis Locations are in Queens County in New York City, and the Linden and North Central Locations are in Nassau County, the relevant minimum wages for the limitations period under the NYLL differ, so they are listed in the chart below.

45

| Minimum Wage Effective Date | NYLL Minimum Wage (Liberty and Francis Lewis Locations) | NYLL Minimum Wage (Linden and North Central Locations) |
|---|---|---|
| 1/5/2015 | $8.75 | $8.75 |
| 12/31/2015 | $9.00 | $9.00 |
| 12/31/2016 | $11.00 | $10.00 |
| 12/31/2017 | $13.00 | $11.00 |
| 12/31/2018 | $15.00 | $12.00 |
| 12/31/2019 | $15.00 | $13.00 |
| 12/31/2020 | $15.00 | $14.00 |

See N.Y. Lab. L. §§ 652(1)(a)-(b).

As Plaintiffs were compensated at a flat weekly sum, the Court must calculate Plaintiffs' hourly wages based on their weekly wages. Under both the FLSA and the NYLL, an employee's hourly wage is calculated by dividing the weekly compensation by the number of hours the employee worked. See 29 C.F.R. § 778.109[18] ("The regular hourly rate of pay of an employee is determined by dividing his total remuneration for employment (except statutory exclusions) in any workweek by the total number of hours actually worked by him in that workweek for which such compensation was paid."); N.Y. Comp. Codes R. & Regs. tit. 12 § 142-2.16[19] ("When an employee is paid on a piece work basis, salary, or any basis other than hourly rate, the regular hourly wage rate shall be determined by dividing the total hours worked during the week into the employee's total earnings."); Fermin, 93 F. Supp. 3d at 42.

---

[18] Although this calculation is typically used to calculate hourly rates for determining overtime damages, courts in this District have applied this regulation for calculating hourly rates for minimum-wage claims as well. See Cao, 727 F. Supp. 3d at 277; Sanchez, 643 F. Supp. 3d at 375.

[19] New York's Hospitality Industry Wage Order uses a different method of calculating an hourly rate for employees employed in the hospitality industry. See N.Y. Comp. Codes R. & Regs. tit. 12 § 146-3.5. This Order does not apply to Plaintiffs, who worked as butchers in a series of grocery stores. See N.Y. Comp. Codes R. & Regs. tit. 12 § 146-3.1.

Pursuant to both state and federal regulations, in order to determine Plaintiffs' hourly rate of pay, the Court will divide Plaintiffs' weekly compensation by the hours Plaintiffs alleged they worked in the complaint.  Using this calculation, the Court here will consider whether Defendants are liable to Messrs. Amador, Ortiz and Avila, respectively, during the limitations period for minimum-wage violations.

### i.    Mr. Amador

Even though Mr. Amador began working for Defendants in or around 2012, the Court will only analyze Mr. Amador's claims from January 1, 2015, when the limitations period under the NYLL began.  See Compl. ¶ 67.  Throughout his employment with Defendants, Mr. Amador received weekly payments in cash.  See id. ¶ 74.  Mr. Amador received a weekly pay of $750, beginning in 2015.  See id. ¶ 75.  Mr. Amador's weekly pay rate increased to $800 "in or around 2017[,]" and to $900 "[i]n or around 2019[.]"  Id.  Mr. Amador's weekly pay rate increased again to $1,000 later in 2019, when Mr. Amador was transferred from the Liberty Location in Queens County to the Linden Location in Nassau County, and did not decrease.  See id. ¶ 76.  Mr. Amador ceased working for Defendants "in or around October 2020[.]"  Id. ¶ 67.

Apart from a period of "several months" in 2019 where Mr. Amador worked at the Linden Location, Mr. Amador worked at the Liberty Location throughout his employment with Defendants.  Id. ¶ 69.  During the weeks in 2019 when Mr. Amador only worked five days per week, he was paid $800 weekly.[20]  See id. ¶ 77.

---

[20] As noted above, see, supra, Part I.B.1, the amount of weekly pay is reported as $1,000 in Mr. Amador's declaration.  See Amador Decl. ¶ 10.

Based on the hours that Mr. Amador worked per week, see, supra, Part III.C.3.a.i., accounting for meal breaks,[21] and the locations where he worked, the Court has calculated the following hourly rates for Mr. Amador's employment, compared to the locally applicable NYLL and FLSA minimum wages.

| Time Period Beginning | Location | NYLL Minimum Wage | FLSA Minimum Wage | Weekly Rate | Hours Worked | Hourly Rate |
|---|---|---|---|---|---|---|
| 1/1/2015 | Liberty | $8.75 | $7.25 | $750.00 | 63-69 | $10.87-$11.90 |
| 1/1/2016 | Liberty | $9.00 | $7.25 | $750.00 | 51-57 | $13.16-$14.71 |
| 1/1/2017 | Liberty | $11.00 | $7.25 | $800.00 | 51-57 | $14.04-$15.69 |
| 1/1/2018 | Liberty | $13.00 | $7.25 | $800.00 | 51-57 | $14.04-$15.69 |
| 1/1/2019 | Liberty | $15.00 | $7.25 | $900.00 | 48-54 | $16.67-$18.75 |
| Several Months In 2019 | Linden | $12.00 | $7.25 | $1,000.00 | 48-54 | $18.52-$20.83 |
| Some Weeks In 2019 | Liberty | $15.00 | $7.25 | $800 | 40-45 | $17.78-$20.00 |
| 1/1/2020 | Liberty | $15.00 | $7.25 | $1,000.00 | 48-54 | $18.52-$20.83 |

See Compl. ¶¶ 67, 69-71, 73-77.

Throughout Mr. Amador's employment with Defendants, Mr. Amador's hourly rates were above both the federal and New York minimum wages. See 29 U.S.C. § 206(a)(1)(C); N.Y. Lab. L. § 652. As such, the Court respectfully recommends that Defendants not be found liable to Mr. Amador for minimum-wage violations under the NYLL and the FLSA.

---

[21] Plaintiffs' damages calculation does not take into account the weeks during which Mr. Amador only worked five days per week. See Pls.' Suppl. Mot. Ex. H at 2. Plaintiffs' damages calculation also takes the average of Mr. Amador's weekly hours worked, accounting for meal breaks. See id. The Court has chosen to keep Mr. Amador's estimated hourly rates as ranges for the purposes of determining whether, for any given week, Mr. Amador would have earned below the NYLL minimum wage.

48

ii.        **Mr. Ortiz**

Mr. Ortiz began working for Defendants "in or around October 2018."  Compl. ¶ 81. Throughout his employment, Mr. Ortiz received weekly payments in cash.  See id. ¶ 88.  Mr. Ortiz received a weekly pay of $290, beginning in October 2018.  See id. ¶¶ 81, 89.  Mr. Amador's weekly pay rate increased to $300 "in or around 2019," and to $600 "in or around the end of 2019," when Mr. Ortiz was transferred to the Linden Location.  Id. ¶¶ 82, 89-90.  Mr. Ortiz's weekly pay rate increased again to $900 after five or six months, when Mr. Ortiz was transferred back to the Liberty Location.[22]  See id. ¶¶ 82, 91.  Beginning in February 2020, when Mr. Ortiz's hours were reduced, Mr. Ortiz's weekly wages were also reduced to $300.  See id. ¶ 92.  Mr. Ortiz ceased working for Defendants "in or around March 2021."  Id. ¶ 81.

Mr. Ortiz worked in the Liberty Location for most of his employment with Defendants, except for a period of "five (5) or six (6) months" between 2019 and 2020, when Mr. Ortiz was transferred to the Linden Location, id. ¶ 82, and for some unspecified periods where Mr. Ortiz would be assigned to cover other employees' shifts at the North Central and Francis Lewis Locations.  See id.  Mr. Ortiz does not state when or how frequently he would be assigned to work at the other locations, how long his coverage periods would be, how many hours he worked, or whether he would receive any meal breaks while working at those locations.  See id. ¶¶ 82, 86.  The Court will assess Mr. Ortiz's claim for shift coverage periods based on his base assignment at the Liberty Location.

_____

[22] Mr. Ortiz does not state in the complaint when he was transferred back to the Liberty Location, but in his declaration, Mr. Ortiz stated that the transfer occurred "in or around late 2019[.]"  Ortiz Decl. ¶ 11.  As it is unclear based on the complaint whether Mr. Ortiz was transferred in 2019 or 2020, the Court will calculate his effective hourly rate against the minimum wage post-transfer for both years.

Based on the hours that Mr. Ortiz worked per week, see, supra, Part III.C.3.a.ii., accounting for meal breaks, and the locations at which he worked, the Court has calculated the following hourly rates for Mr. Ortiz's employment, compared to the locally applicable NYLL and FLSA minimum wages. [23]

| Time Period Beginning | Location | NYLL Minimum Wage | FLSA Minimum Wage | Weekly Rate | Hours Worked | Hourly Rate |
|---|---|---|---|---|---|---|
| October 2018 | Liberty | $13.00 | $7.25 | $290.00 | 60 | $4.83 |
| 1/1/2019 | Liberty | $15.00 | $7.25 | $300.00 | 60 | $5.00 |
| 2019 | Linden | $12.00 | $7.25 | $600.00 | 57 | $10.53 |
| 2019 | Liberty | $15.00 | $7.25 | $900.00 | 60 | $15.00 |
| 2020 | Liberty | $15.00 | $7.25 | $900.00 | 60 | $15.00 |
| February 2020 | Liberty | $15.00 | $7.25 | $300.00 | 20 | $15.00 |
| 1/1/2021 | Liberty | $15.00 | $7.25 | $300.00 | 20 | $15.00 |

See Compl. ¶¶ 81-82, 84-86, 89-92.

Mr. Ortiz alleges that prior to his transfer to the Linden Location, Defendants paid him below the minimum wage. Mr. Ortiz earned less than the New York minimum wage and the federal minimum wage prior to 2019. See 29 U.S.C. § 206(a)(1)(C); N.Y. Lab. L. § 652. As such, the Court respectfully recommends that Defendants be found liable to Mr. Ortiz for minimum-wage violations under the FLSA and the NYLL for the covered period through an approximate date in 2019 only. Given that the NYLL minimum wage rate was higher, the Court

---

[23] Plaintiffs' updated damages sheet does not provide accurate calculations of the Mr. Ortiz's hourly wages, as the sheet erroneously lists Mr. Ortiz's weekly pay as $300 from 2019 through the end of his employment. See Pls.' Suppl. Mot. Ex. H at 4. As such, the Court does not rely on Mr. Ortiz's damages calculation when determining liability.

respectfully recommends that Defendants be found liable to Mr. Ortiz under the NYLL for the period from October 2018 through 2019.

Beginning in late 2019, when Mr. Ortiz was transferred back to the Liberty Location, his hourly rate was equal to the applicable minimum wage in New York.  See N.Y. Lab. L. § 652. As such, Mr. Ortiz's well-pleaded factual allegations do not establish liability for minimum-wage violations beginning in late 2019.

### iii.    Mr. Avila

Mr. Avila began working for Defendants "in or around September 2015[.]"  Compl. ¶ 96. Throughout his employment with Defendants, Mr. Avila received weekly payments in cash.  See id. ¶ 101.  Mr. Avila worked at the Liberty Location and received a weekly pay of $500 throughout his employment with Defendants.  See id. ¶¶ 96, 102.  Mr. Avila ceased working for Defendants "through in or around late August 2018[.]"  Id. ¶ 96.

Based on the hours that Mr. Avila worked per week, see, supra, Part III.C.3.a.iii., accounting for meal breaks,[24] and the locations where he worked, the Court has calculated the following hourly rates for Mr. Avila's employment, compared to the locally applicable NYLL and FLSA minimum wages.

---

[24] Plaintiffs' damages calculation takes the average of Mr. Avila's weekly hours worked.  See Pls.' Suppl. Mot. Ex. H at 3.  The Court has chosen to keep Mr. Avila's estimated hourly rates as ranges for the purposes of determining whether, for any given week, Mr. Avila would have earned below the minimum wage.

| Time Period Beginning | Location | NYLL Minimum Wage | FLSA Minimum Wage | Weekly Rate | Hours Worked | Hourly Rate |
|---|---|---|---|---|---|---|
| September 2015 | Liberty | $8.75 | $7.25 | $500.00 | 60-68 | $7.35-$8.33 |
| 1/1/2016 | Liberty | $9.00 | $7.25 | $500.00 | 60-68 | $7.35-$8.33 |
| 1/1/2017 | Liberty | $11.00 | $7.25 | $500.00 | 60-68 | $7.35-$8.33 |
| 1/1/2018 | Liberty | $13.00 | $7.25 | $500.00 | 60-68 | $7.35-$8.33 |

See Compl. ¶¶ 96, 98-99, 102.

Throughout Mr. Avila's employment with Defendants, Mr. Avila's hourly rates was below the applicable New York minimum wage.  See N.Y. Lab. L. § 652.  As such, the Court respectfully recommends that Defendants be found liable to Mr. Avila for minimum-wage violations under the NYLL.

The limitations period for the FLSA only overlaps with Mr. Avila's employment for one day in August 2018.  See, supra, Part III.C.1.a.  During that time, Mr. Avila's hourly rate was above the federal minimum wage.  See 29 U.S.C. § 206(a)(1)(C).  The Court therefore respectfully recommends that Defendants not be found liable to Mr. Avila for minimum-wage violations under the FLSA.

### c.    Spread-of-hours Violations

New York Labor Law entitles employees who earn the minimum wage or less to earn an additional hour of pay, at the minimum wage, for each day where the employee works more than ten hours.  See N.Y. Comp. Codes R. & Regs. tit. 12 § 142-2.4.  Typically, an employee is not entitled to this spread-of-hours premium if the employee's hourly rate is greater than the minimum wage.  See Fermin, 93 F. Supp. 3d at 45-46 (citations omitted); Jimenez, 744 F. Supp. 3d at 249-50 (collecting cases).

52

Plaintiffs do not seek spread-of-hours damages for Mr. Amador, as his hourly rate exceeded the minimum wage throughout his employment with Defendants.  See Pls.' Suppl. Mot. Ex. H at 2.  The Court will therefore examine Defendants' liability for spread-of-hours pay as to Messrs. Ortiz and Avila only.

The Court finds that Messrs. Ortiz and Avila sufficiently alleged that they were entitled to spread-of-hours pay.  As the Court previously discussed, Messrs. Ortiz and Avila worked for ten hours without breaks for at least part of their employment periods with Defendants.  See, supra, Parts III.C.3.a.ii., III.C.3.a.iii.  For some of these periods during which Messrs. Ortiz and Avila worked for over ten hours at a time, they were paid below the New York minimum wages. See, supra, Parts III.C.3.b.ii., III.C.3.b.iii.

Because Mr. Avila received a flat weekly wage, regardless of the hours he worked, Mr. Avila did not receive a spread-of-hours premium for the shifts where he worked more than ten hours, at or below the minimum wage.  See Compl. ¶ 103.  Plaintiffs do not allege, however, that Mr. Ortiz never received a spread-of-hours premium.  See id. ¶¶ 81-95.[25]  As Mr. Ortiz has not alleged spread-of-hours violations as to his employment specifically, the Court cannot award him damages for spread-of-hours violations.

As such, the Court respectfully recommends that Defendants be found liable to Mr. Avila, but not to Mr. Amador or Mr. Ortiz, for spread-of-hours violations under the NYLL.

### d.    Failure To Pay Wages

Plaintiffs state in their complaint that Defendants' failures to pay minimum wages and overtime premiums constituted unlawful deductions of wages, in violation of N.Y. Lab. L. § 193.

---

[25] By contrast, Plaintiffs allege that Messrs. Amador and Ortiz never earned spread-of-hours premiums.  See Compl. ¶¶ 78, 103.

53

See Compl. ¶¶ 133-34.  Similarly, Plaintiffs allege that because Defendants failed to pay Plaintiffs the wages and premiums which they were owed, Defendants failed to "pay Plaintiffs . . . all of their wages eared within the week such wages were due" in violation of N.Y. Lab. L. § 191.  Id. ¶¶ 132, 134-35.  Plaintiffs do not repeat this claim in either their original or their supplemental default judgment motion papers.  See Pls.' Mem. L.; Pls.' Suppl. Mem. L.  In fact, Plaintiffs only mention of the timing of wage payments comes in their argument about wage notices and wage statements, saying that Plaintiffs did not receive such notices or statements "with their weekly payment of wages or otherwise[.]"  Pls.' Mem. L. at 8.  The Court therefore finds that Plaintiffs abandoned these claims.  See Zabrodin, 702 F. Supp. 3d at 121.

As such, the Court respectfully recommends that Plaintiffs' motion for default judgment be denied as to Plaintiffs' claims for failure to pay wages.

### e.    Failure To Provide Wages Notices And Wage Statements

The NYLL requires each employer to "provide his or her employees . . . at the time of hiring, a notice containing" information about, inter alia, the employee's wages, including the rate of pay, allowances claimed, the employer's name and aliases, and the employee's regular pay day.  N.Y. Lab. L. § 195(1)(a).  Once the employee is hired, the employer must provide a wage statement "with every payment of wages," listing, inter alia, the name of the employer, the rate of pay, gross wages, applicable deductions and allowances, and net wages.  N.Y. Lab. L. § 195(3).  The NYLL provides for statutory damages for violations of this law.  See N.Y. Lab. L. §§ 198(1-b), 198(1-d).

An employer's failure to pay wage notices does not automatically entitle the employee to statutory damages.  A federal court does not have jurisdiction to hear a claim in which the plaintiff lacks standing to sue.  See Spokeo, Inc. v. Robins, 578 U.S. 330, 337-38 (2016) ("The

doctrine [of standing] limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong.").  "To have Article III standing to sue in federal court, plaintiffs must demonstrate, among other things, that they suffered a concrete harm." TransUnion LLC v. Ramirez, 594 U.S. 413, 417 (2021).  A plaintiff must prove standing to sue for each claim asserted.  See id. at 431.  Even when faced with an explicit statutory right, "[o]nly those plaintiffs who have been concretely harmed by a defendant's statutory violation may sue that private defendant over that violation in federal court."  Id. at 427 (emphasis in original).

The Second Circuit has held that in order to sustain a claim for wage-notice and wage-statement violations in federal court, "a plaintiff must adequately allege a concrete injury-in-fact resulting from the failure to provide the wage notices and wage statements[.]"  Guthrie v. Rainbow Fencing Inc., 113 F.4th 300, 302-03 (2d Cir. 2024).  In order to allege this concrete injury, the "plaintiff must show some causal connection between the lack of accurate notices and the downstream harm."  Id. at 308 (noting that such a connection is not present "unless the plaintiff-employee can show that he or she would have undertaken such advocacy and plausibly would have avoided some actual harm or obtained some actual benefit if accurate notices had been provided").  Otherwise, NYLL wage-notice and wage-statements claims must be dismissed for lack of standing.  See id. at 311.

Here, the Court finds that Plaintiffs failed to establish a concrete injury stemming from Defendants' failures to provide wage notices and wage statements.  Messrs. Amador, Ortiz and Avila each allege that they never received wage notices or wage statements when they were first hired, or at any point during their employment.  See Compl. ¶¶ 74, 80, 88, 95, 101, 105.  Plaintiffs do not allege that they suffered any "concrete harm" because of Defendants' unlawful conduct.  TransUnion, 594 U.S. at 417.  Plaintiffs do not allege that they were prevented from

effectively advocating for better wages, that they suspected any discrepancy between the wages to which they were entitled and the wages they received, or that they suffered any adverse consequences because they did not receive information about their wages.  See generally Compl.

As such, the Court respectfully recommends that Plaintiffs' motion for default judgment be denied as to Plaintiff's claims for failure to provide wage notices and wage statements for lack of standing, and that these claims be dismissed without prejudice.

### D.     Damages

Before entering a default judgment, the court "must find a basis for the damages specified in the default judgment." Zabrodin, 702 F. Supp. 3d at 113.  The court has an "obligation to ensure that the damages [are] appropriate." Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., Div. of Ace Young Inc., 109 F.3d 105, 111 (2d Cir. 1997).  "Even when a default judgment is warranted based on a party's failure to defend [an action], the allegations in the complaint with respect to the amount of damages are not deemed true." Credit Lyonnais, 183 F.3d at 155.

In order to determine damages, the court may "presume the accuracy of [plaintiffs'] recollection and estimates of hours worked set forth in their affidavits and damages calculations." Cao, 727 F. Supp. 3d at 296.  Because, under the FLSA, the employer bears the burden to track the hours an employee works, "[a] plaintiff need not compute FLSA damages with precision." Harold Levinson Assocs., Inc. v. Chao, 37 F. App'x 19, 20 (2d Cir. 2002) (summary order).  "However, it remains the plaintiffs' burden to prove damages to a 'reasonable certainty.'" Lopez v. Yossi's Heimishe Bakery Inc., No. 13 Civ. 5050 (FB) (CLP), 2015 WL 1469619, at *9 (E.D.N.Y. Mar. 30, 2015) (quoting Credit Lyonnais, 183 F.3d at 155).  In order to establish this reasonable certainty, the court must "determin[e] the proper rule for calculating

damages . . . and assess[] [the] plaintiff's evidence supporting the damages to be determined under this rule." Credit Lyonnais, 183 F.3d at 155.

"Detailed affidavits and other documentary evidence can suffice in lieu of an evidentiary hearing." Gunawan, 897 F. Supp. 2d at 83. Nevertheless, a court may deny a default judgment motion if "[t]he record evidence does not provide a sufficient basis for determining a damages award." Singh v. Mowla, No. 19 Civ. 4687 (PKC) (LB), 2022 WL 17820099, at *11 (E.D.N.Y. Sept. 30, 2022) (finding that the record "does not even provide enough evidence to establish the number of hours that plaintiffs worked each week," rendering the court unable to "determine [the plaintiffs'] hourly rate of pay"). A court may also decline to award damages in a default judgment motion if the plaintiff cannot prove damages to a reasonable certainty, "even where liability has been established[.]" HTV Indus., Inc. v. Agarwal, 317 F. Supp. 3d 707, 717 (S.D.N.Y. 2018).

Here, even though Plaintiffs have established Defendants' liability as to several of their claims, the Court is unable to determine the proper amount of damages to be awarded with reasonable certainty. An overarching problem with Plaintiffs' damages calculations is that they omit several variations in Plaintiffs' hours and compensation at various points during their employment. For example, as the Court has discussed, see, supra, Part III.C.3.b.i., Plaintiffs' damages calculations omit damages for the weeks where Mr. Amador only worked five days per week. See Pls.' Suppl. Mot. Ex. H at 2. In addition, Plaintiffs' damages calculations do not include the period beginning February 2020 when Mr. Ortiz's hours were reduced, and, as the Court already discussed, see, supra, Part III.C.3.b.ii., list the wrong weekly wages for Mr. Ortiz beginning in 2019. See Pls.' Suppl. Mot. Ex. H at 4. Plaintiffs' damages calculations contain meaningful inaccuracies. See generally Pls.' Suppl. Mot. Ex. H.

There are other relevant omissions limiting the Court's ability to calculate damages to a reasonable certainty. For example, the Court cannot tell, based on Plaintiffs' declarations, how many hours Mr. Amador and Mr. Avila worked per week. Mr. Amador only gives ranges for the hours he worked per week, stating that he worked "sixty-six (66) to seventy-two (72) hours per week, minus breaks" before 2016, and "between fifty-four (54) and sixty (60) hours per week, minus breaks" beginning "in or around early 2016." Amador Decl. ¶¶ 4-5. Based on this information, the Court cannot tell whether Mr. Amador's weekly hours were on the higher or the lower end of the ranges given, or when, precisely, in 2016 Mr. Amador's hours were reduced. These uncertainties would have a significant impact on the overtime premiums which Mr. Amador may be entitled to receive. Mr. Amador also states that he worked "between forty-five (45) to fifty (50) hours per week, minus breaks." Id. ¶ 5. Mr. Amador does not say how frequently he worked these shortened weeks, or whether he worked closer to 45 or 50 hours per week, minus breaks, during these shortened weeks.[26] Similarly, Mr. Avila declares that while he regularly worked ten hours per day, he "was often called in to start one (1) or two (2) hours early." Avila Decl. ¶ 4. Mr. Avila does not state how frequently he was asked to come to work before the start of his shift, either one hour early or two hours early. As such, Mr. Avila's stated hours per week ranged from 60 to 68, without any indication of what an average workweek might be. See id. Because the Court cannot tell, with a reasonable certainty, the hours that Messrs. Amador and Avila worked per week, the Court cannot determine their overtime damages, their "hourly rate of pay," or, in Mr. Avila's case, the difference between this hourly rate and the minimum wage. Singh, 2022 WL 17820099, at *11.

---

[26] As the Court already discussed, if Mr. Amador worked only 45 hours a week not accounting for meal breaks in 2019, he only worked 40 hours per week accounting for breaks. Mr. Amador would not be entitled to any overtime damages for these weeks. See, supra, Part III.C.3.a.i.

The Court also cannot determine damages as to Mr. Ortiz's minimum-wage claims, because Mr. Ortiz's declaration does not specify, to a reasonable certainty, the time periods in which he worked at Defendants' different locations.  Mr. Ortiz declares that while he worked primarily at the Liberty Location, he also worked at the Linden Location for "approximately five (5) or six (6) months" and would occasionally be called in to work at the North Central and Francis Lewis Locations.  Ortiz Decl. ¶¶ 2-3.  Mr. Ortiz does not say how frequently he would be called to work in either the Francis Lewis or North Central Locations, whether he received break time while working at either location, or how many weeks Mr. Ortiz worked at the Linden Location.  See generally id.  As the Linden and North Central Locations are located in Nassau County, those locations were subject to different minimum wages during the relevant years than the Liberty and Francis Lewis Locations.  See, supra, Part III.C.3.b.  Without knowing what minimum wage rates applied to Mr. Ortiz week-by-week throughout his employment, even as an approximation, the Court cannot determine Mr. Ortiz's minimum-wage damages.

As a whole, Plaintiffs fail to plead damages to a reasonable certainty because Plaintiffs fail to give specific time periods as to: (1) the beginnings and endings of Plaintiffs' employment; (2) Plaintiffs' changes in weekly wages; (3) Plaintiffs' changes in hours; and (4) Plaintiffs' changes in working locations.  Plaintiffs' declarations do not give specific weeks or even specific months for major shifts in Plaintiffs' employment periods, such as reductions in work hours, increases in salary, and time off from employment.  Instead, Plaintiffs' declarations generally rely on general statements based on "early," "mid," or "late" in a calendar year, or "in or around" a given month.  See, e.g., Amador Decl. ¶¶ 1, 4-5, 9-10; Ortiz Decl. ¶¶ 1-3, 9-11; Avila Decl. ¶ 1. These ambiguities in Plaintiffs' declarations have significant implications calculating how much

money Plaintiffs are owed in overtime premiums missing minimum wages.[27]  Because the Court

cannot resolve these ambiguities based on Plaintiffs' submissions as they stand, the Court cannot

award damages in Plaintiffs' default judgment motion at this juncture.[28]

The Court notes that, based on Plaintiffs' approximated and general allegations, they

have sufficiently established Defendants' liability for several portions of Plaintiffs' employment,

even though the Court cannot calculate damages to a reasonable certainty based on Plaintiffs'

submissions, such that the Court respectfully recommends denying the damages motion without

prejudice.  Although the Court understands that it may difficult for Plaintiffs to recollect with

specificity the days of their employment, and the Court may rely on their best recollections,

Plaintiffs' motion papers do not identify or explain which dates, hours and calculations the Court

should adopt and why.

As such, should the District Court adopt this report and recommendation, the Court

respectfully recommends that Plaintiffs be given leave to file a new motion for damages

consistent with this report within 30 days of its adoption, if it is adopted.  Any updated statement

of damages should be sworn or affirmed to by Plaintiffs or other persons with personal

knowledge of Plaintiffs' damages and should include a week-by-week approximation of

---

[27] Plaintiffs' statement of damages attempts to break down Plaintiffs' damages by pay period, but the statement does not state why Plaintiffs chose the start and end dates utilized.  See Pls.' Suppl. Mot. Ex. H.  As such, the Court cannot base a damages calculation against the numbers listed in Plaintiffs' statement.

[28] In addition to compensatory damages, Plaintiffs also seek liquidated damages, pre-judgment interest, post-judgment interest, and attorneys' fees and costs.  See Pelton Decl. ¶¶ 26-34, ECF No. 41.  As Plaintiffs' liquidated damages are based off any award of compensatory damages, and as Plaintiffs' counsel are likely to spend more time working on this matter should the District Court adopt this report and recommendation, the Court declines to consider Plaintiffs' requests for additional damages, interest, and attorneys' fees and costs at this time.  The Court respectfully recommends that these requests be denied without prejudice, and that leave be granted for Plaintiffs' damages motion to request these monetary awards as well.

Plaintiffs' hours worked, Plaintiffs' working location, and Plaintiffs' weekly wages.  If Plaintiffs' counsel seeks attorneys' fees, counsel should submit updated billing records and invoices for this action along with any motion for damages.  If the District Court refers the damages motion to the undersigned, Plaintiffs' counsel are to email a "live" spreadsheet of their damages calculation to scanlon_chambers@nyed.uscourts.gov.

## IV.    CONCLUSION

For the reasons stated above, the undersigned respectfully recommends that Plaintiffs' motion for default judgment be granted in part and denied in part as to liability, and denied without prejudice as to damages.  First, the undersigned respectfully recommends that Defendants be found liable for the relevant periods as described above: (1) to Mr. Amador for overtime violations under the FLSA and the NYLL; (2) to Mr. Ortiz for overtime and minimum-wage violations under the FLSA and the NYLL; and (3) to Mr. Avila for overtime violations under the FLSA and the NYLL, and minimum-wage and spread-of-hours violations under the NYLL.  Second, the undersigned respectfully recommends that Plaintiffs' motion for default judgment be denied as to Plaintiffs' unpaid-wages claims, Mr. Amador's minimum-wage claims and spread-of-hours claims, Mr. Ortiz's spread-of-hours claims, Mr. Avila's minimum-wage claims under the FLSA and any claims outside the limitations periods as described herein. Third, the undersigned respectfully recommends that Plaintiffs' motion for default judgment be denied as to Plaintiffs' wage-notice and wage-statements claims, and that such claims be dismissed without prejudice for lack of standing.  Fourth, the undersigned respectfully recommends that Plaintiffs' motion for default judgment be denied without prejudice as to Plaintiff's damages, and that Plaintiffs be permitted to file a motion for damages and other monetary relief based on supporting evidence, sworn or affirmed to by Plaintiffs or other persons

with personal knowledge, consistent with this report and recommendation within 30 days of its adoption, if it is adopted.

## V.    OBJECTIONS

This report and recommendation will be filed electronically.  Any written objections to this report and recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this report.  <u>See</u> 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 72(b).  Any request for an extension of time for filing objections must be directed to the District Judge prior to the expiration of the fourteen-day objection period.  Failure to timely file objections will preclude further review of this report and recommendation either by the District Court or the Court of Appeals.  <u>See</u> <u>Miller v. Brightstar Asia, Ltd.</u>, 43 F.4th 112, 120 (2d Cir. 2022).

The Court will mail a copy of this report and recommendation to Defendants 101-19 Food Corp. at 101-19 Liberty Avenue, Queens, New York 11419; Ruhana Food International LLC at 109-19 Liberty Avenue, Queens, New York 11419; Liberty Wholesale Food Corp. at 109-19 Liberty Avenue, Queens, New York 11419; 241-11 Linden Food Corp. at 241-11 Linden Boulevard, Elmont, New York 11003; 16611 Food Corp. at 351 North Central Avenue, Valley Stream, New York 11580; Ramiza Food Corp. at 351 North Central Avenue, Valley Stream, New York 11580; 351 N. Central Food Corp. at 351 North Central Avenue, Valley Stream, New York 11580; Food Farm Corp. at 8961 Francis Lewis Boulevard, Queens Village, New York 11427; Food Farm Group at 8961 Francis Lewis Boulevard, Queens Village, New York 11427; Syeda Shahtaj at 109-19 Liberty Avenue, Jamaica, New York 11419; Syeda Shahtaj at 31 Copiague Street, Valley Stream, New York 11580; and Sheak Ripon at 05 Green Street, Lehighton, Pennsylvania 18235. *c/m.*

Dated: Brooklyn, New York
March 14, 2025

*Vera M. Scanlon*
_____
VERA M. SCANLON
United States Magistrate Judge

63